**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

———————————————

ALONZO N. LAX,

      Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

      Defendant-Appellee.

No. 06-3173

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 05-CV-4030-SAC)

———————————————

Scott L. Johnson, Tilton & Tilton, Chtd., Topeka, Kansas, for Plaintiff-Appellant.

Christina Young Mein, Special Assistant United States Attorney, Topeka, Kansas (Eric F.
Melgren, United States Attorney, Topeka, Kansas; Frank V. Smith III, Chief Counsel,
Region VII, Social Security Administration, with her on the brief), for Defendant-
Appellee.

———————————————

Before **BRISCOE, McWILLIAMS,** and **TYMKOVICH**, Circuit Judges.

———————————————

**BRISCOE**, Circuit Judge.

———————————————

      Alonzo Lax ("Lax") appeals the district court's order affirming the decision of the

Commissioner of Social Security to deny Lax's application for social security disability

benefits ("SSD") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401(a)-(m) and 42 U.S.C. § 1381. Lax contends that the Administrative Law Judge ("ALJ") erred in determining that Lax's impairment did not meet or medically equal Listing 12.05(B) for mental retardation. We conclude that in the absence of a valid IQ score of 59 or less, the severity prong (B) of Listing 12.05 is not met, and that making factual determinations on the validity of an IQ score is within the province of an ALJ and will be upheld when supported by substantial evidence. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g) and affirm.

I.

*Procedural History*

Lax filed an application for SSD on December 15, 1999, alleging disability as of December 31, 1988. He claimed that he was disabled because he had pain from a prior gunshot wound, could not lift objects or stand for extended periods of time, had poor concentration and memory, and suffered from mental health issues. His claim was denied at the initial and reconsideration levels. After conducting a hearing in March of 2001, the ALJ ruled that Lax was not disabled within the meaning of the Social Security Act. Lax filed a request for review by the Appeals Council, which was denied. In June of 2001, Lax applied for SSI.[1]

---

[1] While Lax's first claim for SSD was pending, his claim for SSI was denied initially and on reconsideration. His SSI claim was subsequently combined with his SSD

(continued...)

In September of 2001, Lax filed a complaint in federal court. On September 17, 2003, the district court adopted the magistrate judge's Report and Recommendation ("R&R"), which concluded that the ALJ's decision should be reversed and remanded to the Commissioner for additional proceedings pursuant to 42 U.S.C. § 405(g). On remand, the Appeals Council vacated the Commissioner's decision and remanded Lax's case to a new ALJ. See 20 C.F.R. § 404.983 (when federal court remands for further consideration, Appeals Council, acting on behalf of Commissioner, may make a decision or remand to ALJ).

In September of 2004, the new ALJ held a hearing to consider Lax's claims for SSD and SSI. In November of 2004, the ALJ issued a decision denying Lax benefits. Because the Appeals Council remanded Lax's case to an ALJ after the federal court's initial remand, the ALJ's decision stands as the final decision of the Commissioner for purposes of our review. 20 C.F.R. §§ 404.984, 416.1484 (2006) (when federal court remands case for further consideration, decision of ALJ becomes final decision of Commissioner unless Appeals Council assumes jurisdiction of case); Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).

Lax then filed a second civil action in federal court. On October 27, 2005, the magistrate issued an R&R recommending reversal of the Commissioner's decision and a remand for further proceedings. After reviewing the Commissioner's objections to the

_____

[1](...continued)
claim.

R&R, the district court rejected the magistrate judge's recommendation and affirmed the decision of the Commissioner on March 9, 2006.

*Medical Background/Evidence of Disability*

Lax completed the tenth grade, but did not finish the eleventh grade because he was incarcerated for battery.[2] He testified at his first administrative hearing that he took special education classes through all levels of his schooling and received mostly Ds and Fs. His educational records confirm his grades and it appears he was enrolled in "LR English," "LD Res English," and "Dev Reading," which he repeated several times.[3] Appellant Appendix ("App.") at 135-36. At his first hearing, Lax claimed that he was unable to hold a job because he had difficulty with memory and concentration. He recalled that he was unable to serve as a cashier because he could not count or give change and that he was fired from the majority of his jobs for failure to keep up with or understand his job duties.

Lax has received mental health treatment for schizophrenia, paranoia, depression, and substance abuse and has considered suicide. He reports difficulty sleeping, with flashbacks of being shot and seeing "people get stabbed and stuff." Id. at 285. Lax has a

_____

[2] Lax has been incarcerated several times during the relevant benefits time period. Under Title II, he cannot receive benefits for any month or any part of which he was in prison for a felony. 20 C.F.R. § 404.468 (2006).

[3] Lax was also enrolled in "LR Careers" and "LD IV R English" and took ninth grade social studies four times. App. at 135. There is no key for these abbreviations. Lax asserts that "LR" stands for "learning resource" and "Dev" stands for "developmental." Appellant Reply Brief at 13.

history of back problems relating to a car accident in 1992. On July 5, 1994, he was hospitalized for a gunshot wound to the right lower chest. In February of 2000, Lax was evaluated by Dr. Perkins, a state agency consultative examiner, who concluded that Lax had mild difficulty with walking and getting on and off of the examination table and a limited range of motion of the lumbar spine because of his gunshot wound, but that there was no paraspinous muscle spasms. Dr. Perkins noted that Lax's "cooperation [wa]s in question during the examination." Id. at 211.

Lax has been evaluated by Dr. McKenna, Ph.D., a state agency psychological consultative examiner, on at least two occasions. After meeting with Lax in February of 2000, Dr. McKenna reported that Lax believed he "c[ouldn't] do anything," but Dr. McKenna noted "[h]e is not mentally retarded and he appears to be functioning in the borderline range, intellectually." Id. at 206. Dr. McKenna reported that Lax was immature and unreliable and "sees himself as slow and needs other people to assist him to complete most tasks." Id. He noted that Lax's abilities to bathe, dress, and eat appeared to be at an independent level, but that Lax relied on his landlord to assist him with meal preparation, shopping, transportation, and laundry. He diagnosed Lax with adjustment reaction with depression (related to his release from prison) and borderline intelligence dependent personality disorder.

Lax was admitted to Shawnee Community Mental Health Center ("Valeo") on April 6, 2000, for problems with poor memory, sleeping, paranoia, headaches, thoughts of suicide, and unresolved grief over his father's death. The intake clinician noted that Lax

-5-

"[s]eems [of] average intelligence, but reports he has [a] learning disability." Id. at 234. His diagnosis summary from the visit was PTSD (post-traumatic stress disorder), major depression (recurrent, moderate), bereavement (provisional), back pain, arthritis in hand, collapsed lung, feet problems, and a learning disability.

Lax received treatment at Valeo for over a year and a half from Dr. Okano, a psychiatrist. Dr. Okano noted that Lax's "mental activities such as understanding, memory, sustained concentration, social interaction and adaptation" were "moderately/severely impaired due to persistent anxiety, fear of interpersonal relationships, flashbacks/nightmares and impaired concentration." Id. at 497.

In May of 2000, Dr. McKenna evaluated Lax and administered an IQ test. The test revealed a verbal IQ of 60, a performance IQ of 62, and a full scale IQ of 57. However, Dr. McKenna reported that Lax's effort on this test was inadequate and that his responses to the testing appeared unreliable. In October of 2001, Lax was evaluated by Dr. Barnett, Ph.D., who administered an IQ test on which Lax achieved a verbal IQ of 58, a performance IQ of 54, and a full scale IQ of 52. Dr. Barnett diagnosed Lax with mental retardation based on his test scores, but noted that "Mr. Lax gives the impression of higher intellectual functioning in a face-to-face interview. I suspect his social functioning may be more consistent with an individual who is functioning in the mildly mentally retarded range, or possibly the borderline range of intellectual functioning." Id. at 482.

On September 12, 2003, Lax was hospitalized for worsening depression and suicidal ideation. After a six-day stay, Lax's discharge diagnoses included major

depressive disorder (recurrent, severe), polysubstance abuse, and chronic neck and left shoulder pain. He received no diagnosis regarding his intellectual functioning.

II.

*Standard of Review*

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. It requires more than a scintilla, but less than a preponderance. Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004). "We consider whether the ALJ followed the 'specific rules of law that must be followed in weighing particular types of evidence in disability cases,' but we will not reweigh the evidence or substitute our judgment for the Commissioner's." Hackett, 395 F.3d at 1172 (internal citations omitted).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Zoltanksi, 372 F.3d at 1200. We may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Id.

*Five-Step Disability Determination*

The Social Security Act defines disability as the "inability to engage in any

-7-

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (2004); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).  This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment. Barnhart v. Walton, 535 U.S. 212, 218-19 (2002).

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  Hackett, 395 F.3d at 1171.  "The claimant bears the burden of establishing a prima facie case of disability at steps one through four." Id.  Step one requires the claimant to demonstrate "that he is not presently engaged in substantial gainful activity."  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). At step two, the claimant must show "that he has a medically severe impairment or combination of impairments."  Id.  At step three, if a claimant can show that the impairment is equivalent to a listed impairment, he is presumed to be disabled and entitled to benefits.  Williams, 844 F.2d at 751.  If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show "that the impairment or combination of impairments prevents him from performing his past work."  Grogan, 399 F.3d at 1261.

"If the claimant successfully meets this burden, the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient RFC [residual

functional capacity] to perform work in the national economy, given her age, education, and work experience." Hackett, 395 F.3d at 1171. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

*Step Three, Listing 12.05(B) for Mental Retardation*

At step three, the determination is made "whether the impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Williams, 844 F.2d at 751; 20 C.F.R. §§ 416.920(d), 404.1520a(d). "If the impairment is listed and thus conclusively presumed to be disabling, the claimant is entitled to benefits." Williams, 844 F.2d at 751. To show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment. See 20 C.F.R. §§ 404.1525, 416.925 (2006).

In this appeal, Lax argues that the ALJ erred in determining that he did not meet the listing for 12.05(B). Listing 12.05, Mental Retardation, states:

> [m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.05 (2006).

This is what is commonly referred to as the "capsule definition" for this listing. In addition to meeting this capsule definition, a claimant must also meet one of the four severity prongs for mental retardation as listed in the regulations. The listing states,

[t]he required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

(A) . . .

(B) A valid verbal, performance, or full scale IQ of 59 or less; or

(C) A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

(D) . . .  See 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.05(A)-(D) (2006).

The ALJ determined that Lax failed to satisfy both the capsule definition for the listing and severity prong (B) of the listing.  In his appeal, Lax argues that he meets the capsule definition for the listing, as well as the criteria for severity prong (B).  In the alternative, Lax argues that the ALJ erred in failing to consider whether he met the criteria for severity prong (C).  We will first examine whether Lax met severity prong (B) of the listing.

*Severity Prong of Listing 12.05(B)*

Lax argues that the district court erred in finding that he did not meet severity prong (B) of the listing, which requires a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05(B) (2006).  "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." See 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.00D(6)(c) (2006).

Lax contends that there are two test results in the record and both establish a full scale IQ below 59.[4] In May of 2000, Dr. McKenna administered the Wechsler Adult Intelligence Scale III ("WAIS-III") IQ test to Lax, who received a verbal IQ score of 60, a performance IQ score of 62, and a full scale IQ score of 57. In October of 2001, Dr. Barnett administered this same test to Lax, who achieved a verbal IQ of 58, a performance IQ of 54, and a full scale IQ of 52. Although these scores fall below the numeric requirement of the listing, the ALJ determined that "[w]hen the entire record is reviewed the low IQ scores cannot beconsidered (sic) as valid." App. at 325.

Lax argues that the ALJ based this conclusion on his own opinions and observations, rather than on valid objective evidence in the record. The Commissioner responds that making factual determinations on the validity of IQ scores is within the province of an ALJ and the record contains substantial evidence to support the ALJ's finding that Lax's IQ scores are not an accurate measurement of his intellectual functioning. We agree.

The ALJ discussed Lax's IQ scores in his analysis of step two and step three of the five-step disability determination. In his analysis of step two, the ALJ noted that in February of 2000, Dr. McKenna diagnosed Lax with "borderline intelligence with a

_____

[4] There was also a third testing of Lax's IQ performed by the Kansas Department of Corrections on September 19, 1995. This test established a verbal IQ of 71, a performance IQ of 88, and a full scale IQ of 77. However, this document was not signed and does not list what specific intelligence test was administered. Because of this, Lax objected to this report and the ALJ sustained his objection. Therefore, we will not consider this report.

dependent personality disorder." App. at 321. In regards to the IQ test Dr. McKenna administered in May of 2000, the ALJ found that Dr. McKenna "clearly renounc[ed] the scores reported" because Lax's "effort [w]as minimal and inadequate" and "his responses appeared 'unreliable.'" Id. at 322. The ALJ also commented on the results of Lax's IQ test administered by Dr. Barnett and stated,

> [t]he claimant was examined by Robert Barnett, Ph.D. on October 11, 2001. Dr. Barnett did not notice any unusual behavior. Dr. Barnett found the claimant's verbal IQ to be 58, his performance IQ was 54, and his full scale IQ was 52. Dr. Barnett expressed his belief that the claimant was actually functioning in a higher range. Id. at 323.

In his analysis at step three,[5] the ALJ determined that Lax's medical evidence demonstrated that he suffers from "depression, reduced intellectual functioning, inability to read and is (sic) status post gunshot wound in thoracic area of back with resulting pain." Id. The ALJ concluded that these are severe impairments within the meaning of the regulations, but that these impairments were not severe enough to meet or medically equal a listing, either singly or in combination. Specifically, in regards to Listing 12.05(B), the ALJ noted disparities between Lax's IQ scores and other evidence in the record and commented that

> [t]he only conclusion that can be reached is that the claimant is either not performing consistently on the tests or he is deliberately attempting to have low scores. When the entire record is reviewed the low IQ scores cannot beconsidered

---

[5] In his analysis at step three, the ALJ made specific findings in direct support of his conclusion that Lax did not meet the capsule definition for Listing 12.05, but he also referenced these findings in support of his conclusion that Lax's IQ scores were invalid and therefore Lax did not meet severity prong (B) of the listing.

(sic) as valid.  No examiner has vouched for the validity of the tests, and the large variations in results raise legitimate questions concerning their validity.  The undersigned will not assume the tests to be valid representations of the claimant's intelligence levels, and will not rely on them to establish a listing level mental impairment.  Id. at 324-25.

The ALJ also determined that Lax's credibility was at issue and concluded that his claims of a mental impairment severe enough to meet Listing 12.05(B) were not supported by objective evidence.

We conclude that it was proper for the ALJ to consider other evidence in the record when determining whether Lax's IQ scores were valid and that the record contains substantial evidence to support a finding that Lax's IQ scores were not an accurate reflection of his intellectual capabilities.  Our decision is consistent with the reasoning of other circuits on this issue.  See Markle v. Barnhart, 324 F.3d 182, 186 (3d Cir. 2003) (noting that Commissioner is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (same); Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir. 1991) (noting that an ALJ may make factual determinations on the validity of IQ scores); Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (Commissioner is not required to make finding of mental retardation based on the results of an IQ test alone).

Dr. McKenna explicitly questioned the validity of Lax's IQ scores.  He commented in a section entitled "Mental Status Examination" that "[Lax's] effort was minimal, and he would get easy items wrong and more difficulty (sic) items correct."  App. at 236.  Under a section entitled "Credibility," Dr. McKenna noted,

[Lax's] effort was inadequate. His responses were vague but coherent. The information provided by [Lax] and <u>his responses to the testing appeared unreliable</u>. His scores appear to be an under estimation of his cognitive abilities. On the memory tests, he recalled items that were in the middle of the test and could not remember primary items or recency items. He would miss easy items and get more difficult items correct. His effort was limited. <u>Id.</u> at 237 (emphasis added).

He diagnosed Lax with "[m]ild mental retardation, but his cognitive abilities reflect his dependent personality features." <u>Id.</u> at 238.

Lax admits that Dr. McKenna noted his limited effort, but argues that Dr. McKenna never stated that Lax was purposefully trying to sabotage his testing results. Instead, he asserts that Dr. McKenna ultimately diagnosed him with mild mental retardation and concluded that Lax's "cognitive abilities reflect his dependent personality features." <u>Id.</u> He argues that the ALJ's determination that his testing was unreliable due to deliberate attempts to sabotage his test results is not supported by the record.

We disagree. Dr. McKenna's comments explicitly question Lax's effort on the test and the ultimate validity of the results. These comments provide substantial evidence to support the ALJ's determination that Lax's IQ scores were not reliable. <u>See</u> 20 C.F.R., pt. 404, subpt. P, App. 1, § 12.00D(6) (2006) (stating that "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation").

Dr. Barnett also commented upon disparities between Lax's observed intellectual functioning and his test scores. Despite diagnosing Lax with "Mental Retardation, NOS

-14-

[not otherwise specified], Consider Moderate Mental Retardation," he concluded under "Diagnostic Impressions" that "Mr. Lax gives the impression of higher intellectual functioning in a face-to-face interview. I suspect his social functioning may be more consistent with an individual who is functioning in the mildly mentally retarded range, or possibly borderline range of intellectual functioning." Id. at 481-82.

Although Dr. Barnett noted that "[Lax] made a good effort to respond to my questions, and the validity of his responses appears satisfactory," he reported this observation under the general "Behavioral Observations" heading of his report. Id. at 481. It is unclear from Dr. Barnett's narrative whether this comment reflects Dr. Barnett's views on the validity of Lax's answers to the WAIS-III test questions or if he was merely commenting on Lax's overall demeanor during the examination and Lax's answers to the interviewer's general questioning. The ALJ may have interpreted this statement to refer only to Lax's overall demeanor and general responses during the exam. Given our standard of review, this interpretation was reasonable. "The substantial-evidence standard does not allow us to displace the agencies' choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1030 (10th Cir. 2001) (quotations omitted).

In addition to the narrative accompanying each of Lax's test results, the ALJ determined that other evidence in the record invalidated Lax's IQ scores because: 1) both clinicians who tested Lax stated that he presents and functions in the manner expected

from a person with borderline intellectual functioning; (2) no professional, including his treating physician, described Lax's behavior as indicative of mental retardation; (3) his educational history indicates a learning disability, rather than mental retardation; (4) Lax's historic capabilities are not consistent with an individual who is mentally retarded; (5) Lax lacked credibility; and (6) the large variations in test results raise questions regarding their validity.  There is substantial evidence in the record to support all but the last finding.

Both Dr. McKenna and Dr. Barnett noted that Lax appears to function at a borderline to mildly mentally retarded range.  In fact, the record contains no opinion from any medical professional that Lax presents as mentally retarded.  Dr. Okano, Lax's treating physician at Valeo, never mentioned that Lax was mentally retarded.  Instead, Lax's intake form from Valeo states that Lax "[s]eems [of] average intelligence, but he reports he has [a] learning disability."[6]  Id. at 549-551.  In over fifty pages of records recounting Lax's treatment at Valeo and describing his reported and observed functioning, there is never any mention that Lax has a significant intellectual impairment.

The ALJ's finding that Lax's educational history is indicative of a student with a learning disability, rather than mental retardation, is supported by substantial evidence. Lax's school records reveal that the majority of his classes were mainstream and that Lax received "Ds" in his freshmen/sophomore physical education classes and an "F" in weight

---

[6] This intake form was not completed by Dr. Okano, but by another clinician, whose precise occupation is unknown.

training, indicating that Lax's poor performance in school was not limited to his academic coursework. Finally, the record indicates that Lax never considered himself to be mentally retarded until several years into the SSD process. Prior to 2002, Lax consistently referred to himself as having a learning disability.

The ALJ's finding that Lax's historic capabilities were not consistent with mental retardation and that Lax's credibility was at issue because Lax was inconsistent in reporting what he was able and unable to do is supported by substantial evidence. There is evidence in the record that Lax provided contradictory information regarding his ability to drive a car and read. This evidence supports the ALJ's finding that Lax's credibility was in question, especially in light of the special deference given to an ALJ's credibility findings. See Zoltanski, 372 F.3d at 1201 (noting that "[an administrative] law judge is in the best position to observe the demeanor of witnesses at a hearing, and, as a result, the [ALJ's] credibility findings deserve special deference").

Finally, the ALJ determined that "large variations in [the test] results raise legitimate questions concerning their validity." Id. at 325. There is no evidence in the record that there was a "large variation" in Lax's IQ test scores because neither Dr. McKenna nor Dr. Barnett commented on any variation in the test results. This finding is not supported by substantial evidence in the record and was legally flawed because an ALJ cannot substitute her lay opinion for that of a medical professional. Sisco v. U.S. Dep't of Health & Human Servs., 10 F.3d 739, 744 (10th Cir. 1993).

Despite this error, there is substantial evidence in the record as a whole to support

-17-

the ALJ's determination that Lax did not provide a valid IQ score below 59 as required by severity prong (B) of the listing. Dr. McKenna explicitly questioned Lax's effort on the IQ test and the validity of his resulting scores and Dr. Barnett noted that Lax presented as if he possessed higher intellectual functioning than his scores indicated. This evidence supports the ALJ's finding that Lax's IQ scores were not a valid reflection of his intellectual functioning. "As long as substantial evidence supports the ALJ's determination, the [Commissioner's] decision stands." Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1500 (10th Cir. 1992).

In the alternative, Lax argues that the ALJ erred in failing to consider whether he met the requirement of Listing 12.05(C). Because Lax fails to develop this argument, we will not consider it. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995). Even if we were to consider it, this argument would ultimately fail because 12.05(C) also requires a valid IQ score and we have already determined that Lax's IQ scores are invalid. Because we have concluded that Lax failed to meet one of the severity prongs of the listing, we need not consider whether he met the capsule definition.

III.

We AFFIRM the district court's order upholding the Commissioner's denial of benefits.