FILED
United States Court of Appeals
Tenth Circuit

December 16, 2024

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

COLLETTE DENISE TALTON,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 23-7069
(D.C. No. 6:21-CV-00316-RAW-GLJ)
(E.D. Okla.)

_____

## ORDER AND JUDGMENT*
_____

Before **PHILLIPS**, **BALDOCK**, and **FEDERICO**, Circuit Judges.
_____

Collette Talton appeals from the district court's judgment affirming the Social Security Administration's (SSA) denial of her application for disability insurance benefits. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

---

\* After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this appeal we are in the frustrating position of reviewing an application for benefits filed more than sixteen years ago and addressing whether Talton was disabled (within the meaning of the Social Security Act) between May 2007 and June 2010, now more than fourteen years in the past.[1] Notwithstanding the time that has passed since Talton filed her application, we conclude the agency's most recent denial was supported by substantial evidence.

## I

## A

Talton, a military veteran, applied for disability insurance benefits on September 9, 2008, alleging she had been disabled beginning May 25, 2007. After an administrative law judge (ALJ) denied her application in 2010, the SSA's Appeals Council remanded for reconsideration. The ALJ denied benefits for a second time in 2014. The Appeals Council declined review of that denial in 2017. Talton sought judicial review, and the district court remanded to the SSA in 2018, concluding the ALJ had failed to adequately

---

[1] Given the passage of time, we concur with the recent statement by the Social Security Commissioner that it is "imperative that [the SSA] issue decisions faster at every level." Testimony by Martin O'Malley, Commissioner, Social Security Administration, before the Senate Committee on Budget (September 11, 2024), *https://www.ssa.gov/legislation/testimony_091124.html* [https://perma.cc/VZ45-PEJX]. We think that imperative also applies to judicial review of the SSA's decisions, and to all involved in the process.

consider Talton's medical records from the Veterans Administration (VA) and the VA's disability rating, and had erred in rejecting the findings of a psychologist who evaluated Talton, Dr. Dennis Rawlings. *See Talton v. Comm'r.*, No. CIV-17-252-JHP-KEW, 2018 WL 4692465, at *4 (E.D. Okla. Sept. 13, 2018), *report and recommendation adopted*, 2018 WL 4690367 (Sept. 28, 2018).

The Appeals Council then directed rehearing by a different ALJ, who denied Talton's application for a third time, in March 2020. In August 2021 the Appeals Council declined to review that denial. Talton then filed this action for judicial review in October 2021. It became ripe for decision in the district court in April 2023. In June 2023, a magistrate judge recommended the agency's denial should be affirmed, and in August 2023 the district court adopted that recommendation, overruling Talton's objections. She filed this appeal in October 2023, and briefing was complete in June 2024.

**B**

Following the district court's 2018 remand, the ALJ held a hearing in February 2020.[2] At that hearing, the ALJ focused the testimony on the period from May 25, 2007, the date Talton alleged her disability began, to June 30, 2010, the date she was last insured.

---

[2] The ALJ convened a hearing in April 2019 but ended it because the medical expert could not access the exhibits.

3

A psychological medical expert, Dr. Daniel Hamill, Ph.D., testified based on his review of Talton's records. He concluded that during the relevant period she had two severe psychological impairments, including (1) post-traumatic stress disorder (PTSD), and (2) major depressive disorder. Dr. Hamill testified that Talton was moderately but not markedly impaired. He also testified that she had "primary insomnia." Aple Supp Appx. X at 2419. He opined that it was important for her to "minimize[e] workplace stresses" because of her PTSD, and so recommended limiting her to only occasional interaction with the general public and coworkers, and "preclud[ing] the stresses that come with assembly line or forced pace assignment." *Id.* at 2416. He also recommended limiting Talton to semi-skilled work.

When Talton testified, her attorney sought to elicit testimony about why she left various jobs before the alleged onset of her disability. The ALJ indicated he would limit that testimony as irrelevant, but he did ask Talton why she had stopped work in certain jobs she held leading up to her alleged onset of disability.

A vocational expert (VE) testified that a person with the limitations recommended by Dr. Hamill would be unable to perform Talton's past jobs but could perform other jobs that exist in the national economy. When the ALJ asked what impact it would have if a person with the same limitations

4

would also be absent from work two or more days a month on a regular and continuing basis, the VE testified that would eliminate all competitive employment.

## C

The ALJ issued a written ruling denying benefits on March 25, 2020. As noted at the hearing, he found Talton had alleged disability beginning May 25, 2007, and that she was last insured (i.e., "last met the insured status requirements of the Social Security Act") on June 30, 2010. Aple Supp Appx. IX at 2362, 2364. The ALJ concluded that Talton was not disabled within the meaning of the Social Security Act between those dates.

Following the agency's five-step sequential evaluation process,[3] at step one, the ALJ found Talton had not worked during the relevant time

---

[3] We have described the five-step evaluation process as follows:

Step one requires the agency to determine whether a claimant is presently engaged in substantial gainful activity. If not, the agency proceeds to consider, at step two, whether a claimant has a medically severe impairment or impairments. . . . At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition listed in the appendix of the relevant disability regulation. If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work. Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy.

period. At step two, he found she had the following severe impairments: "diabetes mellitus, insomnia, obesity, major depressive disorder, anxiety disorder and posttraumatic stress disorder (PTSD)." *Id* at 2364. At step three, he found her impairments did not meet or medically equal the severity of a listed impairment.

The ALJ then assessed Talton's residual functional capacity (RFC). Related to physical impairments, he found she could "perform light work as defined in 20 [C.F.R.] § 404.1567(b)" with some additional limitations. *Id.* at 2368. Related to mental impairments, he adopted Dr. Hamill's recommended limitations, finding: (1) Talton "could have understood, remembered, and carried out simple tasks and detailed tasks but not complex tasks;" (2) she "could have tolerate[d] occasional public contact;" (3) she "could have tolerated a standard level of supervision;" and (4) that her "[j]ob duties should not have included a forced pace or assembly line type of pace." *Id.* In explaining this RFC finding, the ALJ gave "great weight" to Dr. Hamill's testimony and discussed the medical records and evidence at some length, as further discussed below. *Id.* at 2375.

---

*Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (citations and internal quotation marks omitted).

**D**

A magistrate judge concluded the ALJ's March 25, 2020, decision applied correct legal standards and was supported by substantial evidence. He found "no indication . . . that the ALJ misread the claimant's medical evidence taken as a whole" and concluded "[t]he essence of [Talton's] appeal is that the Court should reweigh the evidence and reach a different result," contrary to the applicable standard of review. Aplt. Appx. I at 83, 84. The district court adopted the magistrate judge's recommendation, overruling Talton's objections.

**II**

Because the Appeals Council denied review, the ALJ's March 25, 2020, denial of benefits is the final agency decision for our review. *See Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007). We review the district court's ruling de novo, "independently determin[ing] whether the ALJ's decision is free from legal error and supported by substantial evidence." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (brackets and internal quotation marks omitted). If the ALJ's factual findings are

7

supported by substantial evidence, they are treated as conclusive by a court conducting judicial review. *Id.* (citing 42 U.S.C. § 405(g)).

"[T]he threshold for such evidentiary sufficiency is not high." *Id.* at 103. Substantial evidence "means–and means only–such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). In reviewing for substantial evidence, "we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted). "We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (internal quotation marks omitted).

## III

### A

Talton argues the ALJ erred, and denied her due process, by limiting her testimony to the period from May 25, 2007, to June 30, 2010. We see no error. It is undisputed that those dates are, respectively, the date she alleged she became disabled and the date she was last insured. Therefore, the relevant question–before the ALJ, and in this appeal–is whether Talton was disabled during that time period. *See Flaherty,* 515 F.3d at 1069 (describing the period from when the disability allegedly began through the

date last insured as the relevant time period during which an applicant must establish disability); 20 C.F.R. § 404.131 (defining criteria for disability insured status). Here, the ALJ had extensive evidence in the record from before, during, and after the relevant time period. He had discretion in how to conduct the February 2020 hearing. *See Richardson v. Perales*, 402 U.S. 389, 400 (1971) ("[T]he conduct of the hearing rests generally in the [ALJ's] discretion."). We cannot say the ALJ erred or abused his discretion by limiting the testimony to the relevant time period, and Talton has not cited any authority that required the ALJ to allow testimony about earlier or later events.

We also see no denial of due process. "Social security hearings are subject to procedural due process considerations." *May v. Colvin*, 739 F.3d 569, 573 (10th Cir. 2014) (quoting *Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005)). However, to prevail on a due process claim, Talton would need to "demonstrate that the adjudication was infected by some prejudicial, fundamentally unfair element." *Id.* at 573 (internal quotation marks omitted).

Talton has not shown prejudice. We understand her due process claim to be that she was denied the opportunity to be fully heard. *See* Aplt. Op. Br. at 18 ("[the ALJ] did not allow [Talton] to fully speak . . . ."); *see also Igiebor v. Barr*, 981 F.3d 1123, 1134 (10th Cir. 2020) ("[T]he fundamental

requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted)).

Here, the ALJ had before him evidence from before, during, and after the relevant time period, including records of Talton's work history, and her own testimony from earlier administrative hearings. The testimony disallowed at the February 2020 hearing was about jobs Talton held before the relevant time period, and specifically why she was converted to part-time employment in a job she held in approximately 1997–2000, long before the alleged onset of her disability. On this record, Talton has not shown a likelihood that any additional testimony would have led the ALJ to conclude she was disabled during the relevant period. Her due process claim therefore fails. *See Mays*, 739 F.3d at 574 (rejecting due process claim because claimant "fail[ed] to show a likelihood of a different result").[4]

## B

Like the district court, we conclude the ALJ's March 25, 2020, decision was supported by substantial evidence. The ALJ discussed and relied on a

---

[4] Talton's citation to *Mandrell v. Kijakazi*, 25 F.4th 514 (7th Cir. 2022) is unavailing. In *Mandrell*, because the ALJ was concerned with medical records from after the date last insured, the claimant submitted additional records from relevant dates, but the ALJ did not have a medical expert review the records. *Id.* at 518. Here, Talton's arguments are based on evidence from outside the relevant period, and the ALJ had a medical expert review the records from the relevant period.

wide range of medical records and evidence, including Talton's VA records, and he explained how the evidence supported the RFC findings.[5]

Among other records, the ALJ noted a psychiatric care note from May 2007–just before Talton's alleged onset of disability–in which she reported "doing fine," "with only some anxiety and occasionally feeling down." Aple Supp Appx. IX at 2373 (citing *id.*, III at 591). He summarized records from October 2007, when Talton sought psychiatric care at the VA but reported "'doing OK,'" with "no major issues," and did not want to change her course of treatment. *Id.* (citing *id.*, II at 532 (noting Talton "denied any major mood symptoms" (capitalization altered)). The ALJ also noted a November 2009 mental health consultation in which Talton was reportedly "doing well and she had no acute symptoms of anxiety, depression or psychosis." *Id.* (citing *id.*, V at 1231). These records support the ALJ's conclusion that Talton's impairments were less severe than she alleged, and the finding that her RFC allowed her to work with the identified limitations.

The ALJ also reviewed the November 2008 mental status examination by Dr. Rawlings, who diagnosed major depressive disorder with no psychotic features, anxiety disorder, dysthymic disorder, and PTSD. The

---

[5] The ALJ also addressed Talton's physical impairments. Because her arguments on appeal focus on the ALJ's consideration of her mental impairments, we do not address the ALJ's findings related to physical impairments.

ALJ noted that at the time of those diagnoses, Dr. Rawlings assigned Talton Global Assessment of Functioning (GAF) scores of 40 to 45 for the "past year" and 55 to 60 for the "current year," and a score of twenty-nine of thirty on a mental status exam. *Id.* (citing *id.*, III at 674, 676, 678).[6] The ALJ also reviewed and noted evidence showing Talton's providers gave her GAF scores that showed her level of functioning improved with treatment.

Related to Talton's sleep-related impairments, the ALJ noted her insomnia diagnosis and Dr. Hamill's testimony regarding her diagnosis and sleep-related impairments. But the ALJ also observed that in an October 2008 VA record she had reported sleeping six to eight hours per night on average, with medications. *Id.* at 2373 (citing *id.*, III at 736, 738).

The ALJ also reviewed Talton's VA records and noted the VA's assessment of a "twenty-percent service connected disability" during the relevant period. *Id.* at 2373 (citing *id.*, Vol. V at 1231). But he gave the VA

---

[6] GAF scores are assigned by clinicians on a scale of 0 to 100, "divided into 10 ranges of functioning," with scores meant to "pic[k] a single value that best reflects the individual's overall level of functioning" when considering "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32, 34 (4th ed., text revision 2000) (DSM-IV-TR).

Scores from 51 to 60 reflect moderate symptoms or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Scores from 41 to 50 reflect serious symptoms or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

disability rating "no weight," noting the VA and SSA use "distinct and different" approaches to assessing disability. *Id.* at 2375.

Further, the ALJ reviewed and addressed the opinions of medical experts in the record. Although state agency reviewing physicians had opined Talton had no severe mental health impairments, the ALJ rejected those conclusions as inconsistent with the evidence and gave them no weight. In contrast, the ALJ gave great weigh to the testimony of Dr. Hamill, noting he had opportunity to examine the entire record, had made a thorough study, and is an expert both in psychology and in Social Security rules and regulations.

Given the ALJ's extensive discussion of relevant evidence, we are persuaded his findings, including the RFC findings, are supported by more than enough evidence to meet the substantial evidence standard. Even if the evidence might also have allowed for different conclusions, under our deferential standard of review we will not reweigh it to set aside the ALJ's finding. *See Lax*, 489 F.3d at 1084.

## C

Talton makes several arguments for reversal, all directed to the ALJ's RFC finding and the resulting conclusion that she was able to perform work with the specified limitations. But as explained above, substantial evidence

13

supported the ALJ's findings. Talton's specific arguments neither defeat that conclusion nor point to any legal error.

First, Talton argues the ALJ failed to comply with the directions in the district court's 2018 remand and failed to adequately consider the VA's disability rating. We disagree. The district court directed the SSA to consider the VA records and disability rating, as well as Dr. Rawlings's evaluation. The ALJ did so. The VA's disability rating provided "evidence that the ALJ must consider and explain why he did not find it persuasive," but it was "not binding on the [SSA]." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). The ALJ reviewed and discussed Talton's VA records but explained the VA's disability rating did not show she was disabled because the VA's percentage-based disability rating is unlike the SSA's inquiry into whether a claimant can work. *Compare* 42 U.S.C. § 416(i)(1) (defining "disability" under the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any . . . physical or mental impairment . . . .") *with* 38 C.F.R. § 4.1 (stating VA's "percentage ratings represent . . . the average impairment in earning capacity resulting from . . . [service connected] diseases and injuries . . . .").

Talton has not explained how the VA's twenty-percent disability rating was inconsistent with the ALJ's conclusion that she could perform work that had the specified limitations. We therefore see no reversible

14

error.[7] *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (finding no error in SSA's rejection of state's finding that claimant was totally disabled for workers' compensation purposes where she "ha[d] not pointed to any specific factual finding or evidence in the state disability determination that should have changed" the SSA's decision).

Second, Talton argues Dr. Hamill and the ALJ erred by evaluating her sleep-related impairments using the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) published in 2013, instead of the DSM-IV, which was current in 2007–2010.[8] But there is no indication Dr. Hamill or the ALJ improperly relied on the DSM-V. When Talton's lawyer questioned Dr. Hamill, he testified that the limitations he recommended were consistent with DSM-IV criteria. Likewise, the records relied on by the ALJ from the relevant time period applied the DSM-IV criteria. So even assuming it would have been reversible error to rely on the DSM-V, there is no indication the ALJ did so.

---

[7] Although Talton contends the VA more recently found her forty percent disabled, that was after her date last insured and therefore does not negate the substantial evidence underlying the ALJ's findings.

[8] The DSM-IV-TR was the current revision in 2007-10. Talton refers simply to the DSM-IV. Any differences between the two make no difference here.

Third, Talton argues for reversal based on notes from a VA psychologist who noted Talton had "[c]onsiderable difficulty with work activities due to poor sleep and associated fatigue." Aple Supp Appx. VI at 1468; *see also* Aplt. Op. Br. at 7. But this exam was completed May 5, 2004, years before Talton alleged her disability began, and she then worked in the following years. So this exam does not show the ALJ lacked substantial evidence for his findings as to the relevant time period.

Fourth, Talton argues the ALJ failed to adequately account for evidence showing she is "delusional." Aplt. Op. Br. at 8–9; *see also* Aplt. Reply Br. at 9–11. We see no reversible error. The evidence Talton relies on is not from the relevant time period. She argues that she had "occasional hallucinations" three years before the alleged onset of disability and that she believed her counselor was "discussing her with others" six months after her date last insured, but otherwise cites evidence from years before or after the relevant period. Aplt. Op. Br. at 8.[9] But the ALJ relied on substantial evidence from the relevant time period including: the testimony of

---

[9] Talton's reply brief raises additional dates during the relevant period when she argues she had delusions. *See* Aplt. Reply Br. at 9–10. We generally will not consider arguments raised for the first time in a reply brief. *See Wheeler v. Comm'r,* 521 F.3d 1289, 1291 (10th Cir. 2008). But even if we were to consider the additional points argued in Talton's reply, she still asks us to reweigh the evidence, contrary to our  substantial evidence review. *See Lax*, 489 F.3d at 1084.

16

Dr. Hamill, who opined he did not believe Talton was delusional; an October 2008 VA mental examination reporting "[s]he had no delusions," Aple. Suppl. App. Vol. VIII at 2373 (citing *id.* Vol. 3 at 736); and Talton's GAF scores. Even if the evidence cited by Talton might have also allowed a different conclusion about whether she suffered delusions, she has not shown the ALJ lacked substantial evidence for his RFC findings, or the most work she could still do despite her impairments. *See* 20 C.F.R. § 404.1545(a)(1).

Fifth, Talton argues the ALJ "gave no real credit to how [her] illness . . . affected her ability to actually show up and work." Aplt. Op. Br. at 12. We understand her argument to be that the ALJ failed to adequately evaluate the overall impacts of her impairments–particularly fatigue, absenteeism, and work conflicts, all related to insomnia–and her resulting "inability to successfully work at a full time job." *Id.*

However, her argument is based primarily on her work history, all from before her alleged onset of disability. The ALJ's findings were appropriately based on evidence of the impairments she suffered during the relevant period. Talton has not cited any evidence that would have compelled the ALJ to conclude those impairments would necessarily have led to excessive absenteeism. She also has not shown the jobs she was allegedly unable to keep involved only the kinds of work the ALJ found she

17

could still do, despite her impairments, including work limited to only occasional interaction with the public and no complex tasks. She therefore has not shown her past work history was inconsistent with the ALJ's finding that she could perform jobs with the specified limitations. In sum, her arguments related to the degree of her impairments do not change our conclusion that the ALJ's findings were supported by substantial evidence. Even if it would also have been possible for the ALJ to reach a different conclusion, we will not reweigh the evidence to set aside the ALJ's findings. *See Lax*, 489 F.3d at 1084.

## IV

We conclude the ALJ's March 25, 2020, decision denying Talton's application for disability insurance benefits applied correct legal standards and was supported by substantial evidence. We therefore AFFIRM the judgment of the district court.

Entered for the Court

Richard E.N. Federico
Circuit Judge

18