FILED
United States Court of Appeals
Tenth Circuit

April 4, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

JEANNE M. ANDERSON,

      Plaintiff-Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[*]

      Defendant-Appellee.

No. 12-1102
(D.C. No. 1:11-CV-00586-MSK)
(D. Colo.)

**ORDER AND JUDGMENT**[**]

Before **ANDERSON** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

Jeanne M. Anderson appeals from the district court's decision that affirmed

the denial of her application for disability insurance benefits and supplement security

income. Ms. Anderson alleged disability as of June 2006 due to depression, anxiety

---

[*]     In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure,
Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant-appellee in
this action.

[**]     After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and early Alzheimer's.  An administrative law judge (ALJ) conducted hearings on September 8 and December 5, 2008, and issued a decision on January 13, 2009, in which he concluded that Ms. Anderson was not disabled.  The district court affirmed. This appeal followed.  We have jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), and we affirm.

## I.

Ms. Anderson argues that the ALJ's decision should be set aside on two grounds:  (1) the ALJ failed to properly weigh the medical evidence in formulating her mental residual functional capacity (RFC); and (2) even if the ALJ's assessment of her RFC was accurate, the vocational expert's (VE) testimony as to the jobs she could perform was in conflict with the Dictionary of Occupational Titles (DOT).

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).  In other words, "[w]e consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's."  *Id*. (internal quotation marks omitted).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,] [and] requires more than a scintilla, but less than a preponderance."  *Id*. (internal quotation marks omitted).  Further, the

harmless-error doctrine applies in social security cases "where, based on the material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

## II.

In the summer of 2006, while studying to become a registered nurse, Ms. Anderson said that she was having trouble in her course work, and particularly in math, "a subject she was good at." Aplt. App. at 15. On December 1, 2006, more than six months after she claimed she became disabled, she telephoned the office of her treating physician, Ben Zimmerman, M.D., and left a message stating "she thinks she had a 'mini stroke.'" *Id*. at 300. The office called back a short time later, and Ms. Anderson reported that "her nursing instructor told her she is 'walking crooked'" and she also complained of decreased memory and losing "'her train of thought.'" *Id*. The results of subsequent laboratory and MRI testing were unremarkable.

On December 13, 2006, Dr. Zimmerman gave a diagnosis of "Memory Loss," *id*. at 299, and prescribed Aricept. The pharmacy telephoned Dr. Zimmerman's office on December 28 to report that Ms. Anderson "took a 30 day RX of Ambien in 10 days to sleep through the snow storm and they would only refill one [week's] RX from 12-26-06 to get her through the New Year while she is on vacation." *Id*. The pharmacy was so concerned that it telephoned the following day to make sure that

Dr. Zimmerman was aware of the issue. He wrote on December 29, "Wow, great info! Thanks." *Id*. During the next few months, Dr. Zimmerman continued to fill various prescriptions for Ms. Anderson.

On May 17, 2007, Ms. Anderson telephoned Dr. Zimmerman's office and announced that "she 'has been diagnosed [with] Alzheimer's Disease,' [and] is trying to get in a research [program] & is [requesting] Dr. Ben call her [tomorrow]." *Id*. at 138. The record contains no information as to who made the diagnosis or when it was made. Doctor and patient spoke the following day, and Dr. Zimmerman wrote that "she was accepted. I told I would release records when requested." *Id*. On June 22, Dr. Zimmerman gave a diagnosis of Alzheimer's.

Subsequent treatment notes reveal that Ms. Anderson was feeling well overall and experiencing no severe side-effects from her prescription medications, which included Aricept, Prozac, Ambien and Xanex. There is a record of a knee injury in early 2008, but Ms. Anderson's physical impairments are not at issue on appeal.

Alison Parsons, a psychologist, saw Ms. Anderson for a consultative psychological evaluation in April 2007. Ms. Anderson reported that she lived independently, and did her own cooking, shopping, and house cleaning without any difficulty. She also told Dr. Parsons that she visits her mother in Arizona during the winter and "enjoys her two dogs, playing computer games, visiting with friends, reading and renting movies. She reported she manages her own finances without

difficulty." *Id*. at 305. Ms. Anderson told Dr. Parsons "that she could likely function in a 'menial job.'" *Id*.

As part of the examination, Dr. Parsons administered an IQ test along with tests to assess Ms. Anderson's cognitive flexibility and executive functioning. She achieved a "Full Scale Score of 115 (High Average Range)" on the IQ test, *id*. at 306, and "[a]lthough she scored lower on [cognitive flexibility], her performance on [executive function] showed no impairment," *id*. at 307. Dr. Parsons's diagnostic impressions were to rule out anxiety, depression and Alzheimer's, and she assigned Ms. Anderson a GAF score of 68.[1] She observed that "[a]t the current time, . . . Ms. Anderson is quite capable of a variety of everyday workplace tasks." *Id*. at 308.

In January 2008, Dr. Zimmerman filled out a "Mental Impairment Questionnaire." *Id*. at 130. He indicated that Ms. Anderson suffered from "Depression – Major [and] Alzheimer's []." *Id*. According to Dr. Zimmerman, Ms. Anderson did not meet the competitive standards necessary to perform even unskilled work because she lacked the ability to: (1) remember work-like procedures; (2) understand and remember very short and simple instructions;

---

[1] The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32. A GAF of 68 indicates "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. at 34.

(3) maintain attention for two-hour segments; (4) complete a normal workday and workweek without interruptions from psychologically-based symptoms; (5) perform at a consistent pace without an unreasonable number and length of rest periods; (6) respond appropriately to changes in a routine work setting; and (7) deal with normal work stress. He did opine that she was seriously limited, but not precluded from carrying out very short and simple instructions and from getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Last, he opined that she had a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." *Id*. at 134.

In April 2008, the ALJ wrote to Dr. Zimmerman asking him to clarify his opinions. In particular, the ALJ asked for his "assistance in understanding your opinions and the bases for them," including the "objective data [that] was used to make **all of the determinations as to her limits.**" *Id*. at 124. Dr. Zimmerman responded that "Ms. Anderson suffers from Alzheimer's Disease. She is currently in the middle stages of the disease with moderate short term memory loss and slight long term memory loss. The prognosis is as usual with slow gradual progression of memory loss." *Id*. at 338.[2] In June, the ALJ wrote again to Dr. Zimmerman requesting the objective data. He responded:

---

[2] Following an MRI and laboratory tests, Dr. Zimmerman diagnosed Ms. Anderson in December 2006, with "Memory Loss." Aplt. App. at 299. It wasn't until

(continued)

I had thought we were finished with this case long ago, but apparently not. I have known Ms. Anderson for approximately twelve years. . . . While I did not perform any formal physical exam, I am not aware that any physical features are manifest in Alzheimer's disease. While not noted, her apparent confusion and memory lapses were apparent during our interview. Normal labs and MRI ruled out any organic issues; this leaves Alzheimer's as the diagnosis. Her memory fortunately has improved on Razadyne (a medicine indicated for dementia of Alzheimer's type.

*Id*. at 339.

Peter Quintero, a neurologist, performed a consultative physical examination of Ms. Anderson on February 29, 2008. In addition to describing a knee injury and completing a "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)," *id*. at 332-37, Dr. Quintero, made some comments concerning Ms. Anderson's mental limitations.[3]

Lynn Parry, a neurologist, evaluated Ms. Anderson in April 2008, and completed a "Mental Impairment Questionnaire." *Id*. at 358-66. Dr. Parry found that Ms. Anderson was "[s]eriously limited, but not precluded," from being able to perform unskilled work, *id*. at 363, but is "unable to work outside [the] home," *id*.

after Ms. Anderson called him in May 2007 and told him that she had been diagnosed with Alzheimer's, that Dr. Zimmerman gave his June 2007 diagnosis of Alzheimer's. More to the point, there is no evidence in the record that Dr. Zimmerman conducted any further testing to support his June diagnosis, which in turn appears to have been based on what Ms. Anderson told him.

[3] Dr. Quintero wrote that Ms. Anderson "could repeat four numbers forward and three in reverse. She recalled two of four objects in five minutes. She made numerous mistakes when performing serial 7's. . . . She interpreted proverbs poorly." Aplt. App. at 329. He concluded that Ms. Anderson "does have significant impairment with cognitive function." *Id*. at 330.

at 366.  She also wrote that "Ms. Anderson is not able to work [] competitively at the present time however she needs a specific diagnosis if any determination is to be made of long-term deficits.  I think it is reasonable to assume that she is not capable of competitive work for at least 12-18 months."  *Id*. at 359.

"In an effort to clarify the nature and severity of any mental impairment(s) the [ALJ] obtained testimony from Dr. Robert E. Pelc, a licensed psychologist familiar with the Social Security Listing of Impairments set forth in the regulations. . . ."  *Id*. at 21.  The ALJ also obtained testimony from Gayle Humm, M.D.  At the September 2008 hearing, Dr. Humm testified that Dr. Zimmerman's "diagnosis of Alzheimer's was not even supported by the record."  *Id*. at 51.  She explained, among other things, that a diagnosis of Alzheimer's is "somewhat of a diagnosis of exclusion," *id*., and that Dr. Zimmerman's "workup [was] completely inadequate," citing as examples his failure to administer a "mental status examination," or conduct more laboratory tests, *id*. at 52.

Dr. Pelc also testified at the September 2008 hearing.  He opined that the testing performed by Dr. Parsons did not reflect any memory difficulties and more to the point, was "not diagnostically conclusive," in light of Ms. Anderson's high IQ scores, *id*. at 58.

At the supplemental hearing in December 2008, Dr. Pelc testified again.  He opined that Ms. Anderson had mild limitations in activities of daily living, social functioning, concentration, persistence and pace, and that she was mildly impaired in

terms of processing simple information.  He noted in particular that "[t]he formal psychological testing that was done [by Dr. Parsons] . . . was basically . . . within normal limits," *id*. at 30, and that there was no evidence to support any of the marked limitations found by Dr. Zimmerman.

The ALJ found at step two of the five-step sequential evaluation process that Ms. Anderson had the severe impairments of depression, cognitive disorder not otherwise specified [NOS], and anxiety disorder NOS.  At step four, the ALJ found that Ms. Anderson "has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she can understand, remember and carry out only simple instructions."  *Id*. at 15.  At step five, the ALJ determined that, based on the testimony of the VE, Ms. Anderson "would be able to perform the requirements of all unskilled work (specific vocational preparation (SVP) 2)."  *Id*. at 23.  He further noted the VE's testimony that even if Ms. Anderson "could not work in close proximity to others . . . without being distracted . . . the [VE] still identified other unskilled occupations that exist in significant numbers [that Ms. Anderson] could perform."  *Id*. at 24.  As such, he found that Ms. Anderson was not disabled.

III.

A.  Alzheimer's Disease

Ms. Anderson argues that the ALJ erred in concluding that Alzheimer's disease is not a medically determinable impairment.  The ALJ did find, however, that

in addition to the impairments of depression and anxiety, Ms. Anderson had a "cognitive disorder." *Id*. at 13. We agree with the Commissioner that even if Alzheimer's is a medically determinable impairment (for which Ms. Anderson provides no authority), the failure to label her cognitive impairment as Alzheimer's is harmless error because the focus of the analysis is on the functional limitations caused by the impairment, not on the label attached to the impairment. *See Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) ("The mere fact that [the claimant] was diagnosed as suffering from [a particular disease or condition] does not automatically mean that [s]he is disabled.").

B. Dr. Zimmerman

The ALJ found that Dr. Zimmerman's opinion was "neither controlling nor entitled to any significant weight." Aplt. App. at 19. According to Ms. Anderson, the ALJ should have given controlling weight to Dr. Zimmerman's opinion concerning her mental impairments and their limiting effects on her ability to perform any work. Alternatively, she argues that the ALJ's decision was technically deficient because in regards to her mental impairments, he did not commit to writing his findings on the two factors set forth in *Watkins v. Barnhart*, 350 F.3d 1297, 1299-1300 (10th Cir. 2003), to determine whether Dr. Zimmerman's opinion was entitled to controlling weight. We reject the arguments.

In evaluating a treating physician's opinion, the ALJ must first consider "whether the opinion is well-supported by medically acceptable clinical and

laboratory techniques [and, if so, whether it] is consistent with the other substantial evidence in the record." *Watkins*, 350 F.3d at 1300 (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If so, the ALJ must give the opinion "controlling weight." *Watkins*, 350 F.3d at 1300. If the opinion is not entitled to controlling weight, the ALJ should next weigh the opinion "using all of the factors provided in . . . § 404.1527 and 416.927." *Id*. (internal quotation marks omitted). Importantly, the ALJ does not need to discuss each and every factor outlined in *Watkins*. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). All that is required is that "the ALJ's decision be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. (internal quotation marks omitted).

In her opening brief, Ms. Anderson outlines Dr. Zimmerman's treatment notes and the mental impairment questionnaire. In particular, she argues that because "Dr. Zimmerman's opinions are well supported by diagnostics, by his own treating notes and by other evidence in the record," Aplt. Opening Br. at 20, they were entitled to controlling weight. Ms. Anderson's argument, in essence, asks this court to reach a different conclusion about the weight to be afforded Dr. Zimmerman's opinion. However, we cannot reweigh the evidence. *See Lax*, 489 F.3d at 1084.

Ms. Anderson's second argument is an alleged technical deficiency in the ALJ's decision. She argues that the ALJ's failure to write that Dr. Zimmerman's

opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques is reversible error. We disagree.

The first *Watkins* factor looks at whether the opinion is well supported by medically acceptable clinical and laboratory testing. But because there are no conclusive clinical or laboratory techniques by which to diagnose Alzheimer's, the ALJ's failure to mention this factor is unremarkable. As such, the ALJ understandably looked at the second *Watkins* factor and concluded that Dr. Zimmerman's "diagnosis" of Alzheimer's was inconsistent with the other substantial evidence in the record. The relevant point is that "the ALJ provided good reasons in his . . . [comprehensive decision] for the weight he gave to [Dr. Zimmerman's] opinion[] . . . [and] [n]othing more was required in this case." *Oldham*, 509 F.3d at 1258.

C. Dr. Quintero

On appeal Ms. Anderson argues that the ALJ did not properly evaluate Dr. Quintero's opinion concerning her mental impairments. In the district court, however, Ms. Anderson, who was represented by counsel, argued only that the ALJ did not afford the proper weight to Dr. Quintero's opinion concerning her *physical* limitations. Aplee. Supl. App. at 8-9. Because Ms. Anderson did not argue error in the district court as to Dr. Quintero's assessment of her mental impairments, we will not consider this argument for the first time on appeal. *See Crow v. Shalala*, 40 F.3d

323, 324 (10th Cir. 1994) ("Absent compelling reasons, we do not consider arguments that were not presented to the district court.").

D.  Dr. Pelc

Ms. Anderson argues error as to the ALJ's treatment of Dr. Pelc's opinion on two grounds.  First, she argues that the ALJ erred by "not includ[ing] in his own RFC assessment that [Ms. Anderson] had moderate limitations with regard to concentration, persistence or pace, or moderate limitations in short-term memory." Aplt. Opening Br. at 15.

At step three of the sequential-evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  At step four, the ALJ determines the claimant's RFC.  At the December 2008 hearing and in relation to step three, the ALJ asked Dr. Pelc to "review with [him] the B criteria contained in the [relevant] listings and your opinions as to their severity[.]" Aplt. App. at 29.  It was in the *specific context* of the step-three analysis that Dr. Pelc testified that he "felt that the moderate limitation was applicable in terms of [Ms. Anderson's] overall cognitive and concentration, persistence and pace functioning." *Id*. at 30.  As the ALJ explained, "[t]o satisfy the 'paragraph B' criteria, the mental impairments must result in at least two of the following:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or

- 13 -

repeated episodes of decomposition." *Id*. at 14. Based on the medical evidence and Dr. Pelc (who reviewed all the documentary evidence), the ALJ concluded she did not meet any listing, noting that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process," *id*.

We agree with the Commissioner that "the ALJ was not required to include any of Dr. Pelc's 'B criteria' opinions in his RFC assessment," Aplee. Br. at 30, and that "[Ms.] Anderson's argument simply misunderstands the sequential evaluation process," *id*. *See* SSR 96-8p, 1996 WL 374184, at \*4 (July 2, 1996) (stating that "the [ALJ] must remember that the limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process").

Despite the fact that the ALJ found that Ms. Anderson was limited to work that required her to "understand, remember and carry out only simple instructions," Aplt. App. at 15, she argues that the ALJ ignored "Dr. Pelc's opinion regarding [her] short-term memory function," Aplt. Opening Br. at 13. He did not.

As part of the RFC assessment, the ALJ must consider the claimant's work-related mental limitations, such as the "abilit[y] to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes

- 14 -

in a routine work setting." SSR 96-8p, 1996 WL 374184, at *6; *see also* 20 C.F.R. §§ 404.1521(b), 416.921(b) (same). In making his RFC assessment, the ALJ asked Dr. Pelc "whether or not [Ms. Anderson's] ability to understand, remember, and carry out instructions is in any way affected by any of [her] mental impairments." Aplt. App. at 31. He responded that "the limitations in that area would be mild in terms of processing any simple information. It would be moderate in terms of processing more complex or detailed information." *Id*. Dr. Pelc defined "moderate" to mean "[t]hat she would retain the general capacity to function in that area even though she might encounter some difficulties or have some problems in handling such detailed information. But it would not be a significant limitation that would preclude her functioning, but that there would be some [e]ffect on her functioning in that domain." *Id*. at 32.

We agree with the Commissioner that the ALJ accounted for Dr. Pelc's opinion that Ms. Anderson had moderate limitations in her ability to understand, remember, and carry out detailed or complex instructions when he limited her to performing work limited to understanding, remembering, and carrying out only simple instructions. And because the ALJ found that she had a moderate limitation in this area, there is no merit to the argument that the ALJ ignored or rejected Dr. Pelc's opinion on this issue.

E. The VE's Testimony

After considering Ms. Anderson's age, education, work experience, and RFC, the VE testified that Ms. Anderson "would be able to perform the requirements of all unskilled work (specific vocational preparation (SVP) 2)."[4] Aplt. App. at 23; *see also id.* at 79. The VE further testified that even if Ms. Anderson had additional limitations that the ALJ said were not supported by the record, including not being able to work in close proximity to others without being distracted, there were "other unskilled occupations that exist in significant numbers [Ms. Anderson] could perform with examples including: cleaner, housekeeping DOT code 323.687-014, with 3,800 jobs in Colorado and 370,000 jobs in the United States; cleaner, industrial, DOT code 38[9].683-010, with 2,100 jobs in Colorado and 280,000 jobs in the United States." *Id.* at 24; *see also id.* at 79-80.

Ms. Anderson argues that the VE's testimony was inconsistent with the DOT because the DOT provides that some unskilled jobs require a Reasoning Development Level of 3, which she allegedly lacks. Reasoning Development Levels, as defined in the DOT, are a division of "General Educational Development (GED)" and are rated between "1" and "6." U.S. Dep't of Labor, Dictionary of Occupational Titles, Vol. II, App. C, III (4th Ed. Rev. 1991). GED does not describe specific mental or skill requirements of a particular job, but rather describes the general educational background that makes an individual suitable for the job, broken into the

---

[4]    "[U]nskilled work corresponds to an SVP of 1-2." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

- 16 -

divisions of Reasoning Development, Mathematical Development and Language Development.

Assuming there was a conflict between the VE's testimony and the DOT, the ALJ's failure to resolve the alleged conflict was harmless error. Even if Ms. Anderson was limited to unskilled work that had a Reasoning Development Level of 1, the VE identified at least two such jobs (Cleaner, Housekeeper and Sweeper Cleaner, Industrial) that the ALJ found exist in significant numbers, which finding she does not dispute. Thus, the error was harmless because no reasonable factfinder could have resolved the factual matter any other way. *Allen*, 357 F.3d at 1145.

The judgment of the district court is affirmed.

Entered for the Court

Wade Brorby
Senior Circuit Judge