FILED
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

DAVID VITITOE,

      Plaintiff-Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant-Appellee.

No. 12-1484
(D.C. No. 1:11-CV-02996-LTB)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and
**BACHARACH**, Circuit Judge.

David Vititoe appeals from the district court's judgment affirming the

Commissioner of Social Security's decision to deny his application for disability

insurance benefits.  Exercising jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C.

§ 1291, we affirm.

---

[*]      After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. BACKGROUND

### A. Medical evidence

Mr. Vititoe was born in June 1971. He applied for disability insurance benefits in December 2007, and his date last insured (DLI) was June 30, 2008. He based his disability claim on memory loss due to injuries sustained on October 26, 2007, when his motorcycle collided with a large truck. He suffered multiple facial and cranial fractures and a traumatic brain injury. He was in a coma for nearly a month, had a number of surgeries, and received in- and out-patient rehabilitative therapy at Spalding Rehabilitation Hospital.

On January 7, 2008, after his time at Spalding ended, Mr. Vititoe saw a rehabilitation physician, Dr. David Mulica, who opined that "he has limited insight into his deficits" and "is probably more impaired than he appears today." Tr. at 355.[1] Mr. Vititoe was emotionally labile but could recall recent presidents back to Gerald Ford, knew that Dick Cheney was then Vice President, correctly performed single calculations and explained similarities for two objects, and was able to recall one out of three objects at three minutes. Physically, Mr. Vititoe's cranial nerves were intact; his strength, bulk, and tone were normal; his reflexes were symmetric; his finger-to-nose and heel-to-shin tests were normal; he could perform tandem walking;

---

[1] We cite to the agency transcript page number for all citations to the agency's record because the parties do so. However, we cite to our record page number when referring to documents not part of the agency record, such as documents filed only in the district court.

and his gait was grossly normal.  Dr. Mulica increased Mr. Vititoe's trazodone (an antidepressant), continued him on Aracept (for memory), and recommended speech therapy from Ellen Minick.  He asked Mr. Vititoe to follow up with him in April.

Mr. Vititoe saw Ms. Minick for speech therapy several times between January 8 and February 19, 2008.  In the progress note from the last visit, Ms. Minick stated that Mr. Vititoe "exhibited excellent planning, self-monitoring and self-correction.  He was able to stay on task even with numerous distracters.  He was able to complete the task accurately and timely." *Id.* at 345.

Mr. Vititoe saw Dr. Mulica again on April 21, 2008, complaining about anger and temper problems and some ankle pain, but he stated that he "seems to be getting better." *Id.* at 484.  Dr. Mulica suggested anger management and prescribed Celexa for depression.  Mr. Vititoe followed up by telephone on May 21, 2008, stating that he was "less emotionally labile on Celexa" and that his leg buckled under him. *Id.* at 769.  Mr. Vititoe next saw Dr. Mulica on June 12, 2008, complaining of left ankle pain and left thigh numbness.  Dr. Mulica noted that Mr. Vititoe scored "moderate on dep[ression] screen" and increased the dosage of Celexa. *Id.* at 764.  Dr. Mulica's telephone follow-up with Mr. Vititoe on July 10, 2008, showed he was doing well on the increased dosage.  Dr. Mulica next saw Mr. Vititoe on August 13, 2008, when Mr. Vititoe complained that his "depression hits harder at times," he was "experiencing word finding issues," and he "[n]eeds to make lists." *Id.* at 761.  Dr. Vititoe thought these complaints were "not surprising" but "consistent with [the]

original injury." *Id.* He increased the Celexa and asked Mr. Vititoe to call him in a week. Mr. Vititoe's next contact with Dr. Mulica was by telephone on December 29, 2008, when he said he was "[s]till having problems with memory and cognition." *Id.* at 732. Dr. Mulica "[e]ncouraged" Mr. Vititoe to "contact speech[]" and prescribed Amantadine for memory and cognition. *Id.*

Dr. Mulica did not hear from or see Mr. Vititoe again until an office visit on March 24, 2010. Mr. Vititoe stated he had been in prison for much of the preceding year due to a parole violation and was "now developing increased anger." *Id.* at 714. Dr. Mulica prescribed Ativan for anxiety and asked Mr. Vititoe to follow up by phone in three weeks. During that follow-up, on April 14, 2010, Dr. Mulica increased the dosage of Ativan. *Id.* at 712.

On April 22, 2010, Dr. Mulica completed a Functional Capacity Questionnaire (FCQ) reflecting his opinion that, due to the brain injury and impaired cognition, Mr. Vititoe had severe physical and mental limitations and would miss more than four days of work each month. Those limitations included rarely lifting no more than ten pounds; standing/walking two hours and sitting four hours per eight-hour workday; marked restrictions in maintaining concentration, persistence, and pace; and repeated episodes of decompensation within a twelve-month period, each of at least two weeks' duration. *Id.* at 679-80.

Mr. Vititoe was also examined, at the Commissioner's request, by Brett Valette, Ph.D., and Dr. Laura Moran, M.D. Dr. Valette performed a psychological

examination on April 21, 2008, administering tests on which Mr. Vititoe performed in the average range for most memory functions but above average in visual immediate memory. He had a full-scale IQ of 98 and a GAF (Global Assessment of Functioning) score of 70-75.[2] Dr. Valette diagnosed him with a nonspecific cognitive disorder and stated that although Mr. Vititoe's memory function may have been higher before his accident, it was still in the average range.

Dr. Moran performed a physical examination of Mr. Vititoe on May 19, 2008. Mr. Vititoe exhibited an inability to walk on his toes, decreased right hip strength, and numbness of his right anterior thigh. Dr. Moran noted that although Mr. Vititoe complained of some ankle and lower back pain, the examination findings of those areas were normal. She stated that she would not limit his physical activities.[3]

### B. The agency's decision

After Mr. Vititoe's disability application was denied initially and on review, an Administrative Law Judge (ALJ) held a hearing at which Mr. Vititoe was

---

[2] A GAF score of 61-70 indicates: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n Diagnostic & Statistical Manual of Mental Disorders 34 (Text Revision 4th ed. 2000). A GAF score of 71-80 indicates: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.*

[3] We will discuss any additional relevant medical evidence in connection with our analysis of the issues raised in this appeal.

- 5 -

represented by counsel.  Mr. Vititoe, his wife, and a vocational expert (VE) testified.

Among other things, Mr. Vititoe stated that he forgets things like appointments and

what he's read; has no sense of smell; gets shooting pain in his leg, back, and

shoulder when he sits or stands too long; has poor impulse control; cannot manage

his personal finances; and can sit for only ten or fifteen minutes before having to lie

down for an hour or an hour-and-a-half.  He also said that his medicines make him

irritable and sap his energy, his right leg is numb and buckles if he does not support

himself, and he cannot look up without getting dizzy.  He further noted that shoe

inserts Dr. Mulica had given him for right knee pain had caused more problems, and

that he had two surgeries for an airway scar caused by a breathing tube used during

the month following his accident.

In a decision dated September 20, 2010, the ALJ denied benefits.  The ALJ

found that Mr. Vititoe had two severe impairments—"status-post multiple skull and

facial fractures requiring two repair surgeries/craniotomies and resulting in mild

cognitive disorder, and mild degenerative lumbar disc disease," *id.* at 23—but neither

impairment met or medically equaled one of the impairments listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1 (the Listings).  The ALJ next found that Mr. Vititoe

had the residual functional capacity (RFC) to perform light work with a variety of

limitations, including that he not be required (1) "to sit for more than 45 minutes at

one time without the opportunity to stand," (2) "to do more than the lower-end of

detailed instructions," or (3) "to have more than superficial interaction with the

- 6 -

public." Tr. at 25. In reaching that RFC, the ALJ rejected the more severe limitations expressed in Dr. Mulica's FCQ. Based on that RFC and the VE's testimony, the ALJ found that Mr. Vititoe could not have returned to his past relevant work through his DLI. The ALJ next found that Mr. Vititoe could not perform the full range of light work due to the noted limitations, and therefore the Medical-Vocational rules (the Grids) could not be used to direct a finding that he was not disabled. The ALJ then determined, based on the VE's testimony, that Mr. Vititoe could have performed other work prior to his DLI that existed in significant numbers in the national economy, such as photocopy machine operator and office helper. Accordingly, the ALJ found Mr. Vititoe not disabled at step five of the sequential process set forth in 20 C.F.R. § 404.1520(a)(4).

Through counsel, Mr. Vititoe appealed to the Appeals Council and supplied additional evidence for the Council's consideration. Only one piece of that evidence is germane to the issues properly before us in this appeal—a letter dated November 11, 2010, from Mr. Vititoe's chiropractor, Paula Santistevan, stating that Mr. Vititoe had a variety of physical and mental issues that precluded him from working. In considering this letter, the Council pointed out that the ALJ had decided the case through Mr. Vititoe's DLI, June 30, 2008, but Ms. Santistevan's letter concerned a later period of time. Therefore, the Council concluded it did not affect the disability determination and did not make it part of the administrative record.

## C.     The district court's decision

Mr. Vititoe filed a pro se complaint in the district court seeking review of the Commissioner's decision.  In addition to his substantive arguments, he asked (albeit in his reply brief) for a remand under sentence six of 42 U.S.C. § 405(g) for consideration of medical reports from Dr. Alan Weintraub, M.D., and James Berry, Ph.D., that he had attached to his opening brief.[4]  Both reports contained extensive examination findings, and both sources stated that Mr. Vititoe was incapable of working, primarily due to his cognitive limitations.  The district court affirmed the ALJ's decision and denied the remand request because the reports were completed in 2012 by medical sources who had not treated Mr. Vititoe prior to his DLI.  The court concluded that the reports did not relate to the relevant time period and therefore were not material to whether Mr. Vititoe was disabled prior to his DLI.  This appeal followed.

## II.     DISCUSSION

"We review the district court's decision de novo and independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence."  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as

---

[4]     In relevant part, sentence six of § 405(g) provides that a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding."

- 8 -

adequate to support a conclusion." *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (internal quotation marks omitted). We cannot "reweigh the evidence" or "substitute our judgment for that of the agency." *Id.* (internal quotation marks omitted). Because Mr. Vititoe is pro se, we afford his filings a liberal construction, but we do not act as his advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

An important requirement in this case is that Mr. Vititoe had to show he was disabled on or before his DLI—June 30, 2008. *See* 20 C.F.R. § 404.131(b) ("To establish a period of disability, you must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled."); *Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1348-49 (10th Cir. 1990) (stating that "the relevant analysis is whether the claimant was actually *disabled* prior to the expiration of [his] insured status"). As relevant here, disability means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The statute's twelve-month "duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Thus, in Mr. Vititoe's case, he had to show that on or before June 30, 2008, he was unable to engage in any substantial gainful activity for a

continuous twelve-month period, not simply that he had sustained a brain injury on or before that date which may have led to such an inability that began after that date.

Mr. Vititoe first argues that the ALJ did not properly evaluate the opinions of two treating sources, Dr. Mulica and Dr. Mark Matthews, M.D. This argument is not well developed, but as to Dr. Mulica, we read it as taking issue with the ALJ's rejection of the opinion expressed in the FCQ Dr. Mulica completed on April 22, 2010. If accurate, the limitations in that opinion would render Mr. Vititoe disabled under the Social Security Act. But the ALJ rejected that opinion because it was inconsistent with Dr. Mulica's treatment records from January through April 2008, which showed that Mr. Vititoe did not report any significant cognitive deficits, and from March 2010, which showed that Mr. Vititoe complained only of increased anger and provided no physical or mental limitations. The ALJ also found that there were no significant mental status findings in Dr. Mulica's treatment records to support such serious functional limitations, and the FCQ was authored long after Mr. Vititoe's DLI. Accordingly, the ALJ found that the opinion was entitled to no weight with regard to whether Mr. Vititoe was disabled on or before his DLI.

We see no error. Under 20 C.F.R. § 404.1527(c), a number of factors bear on an ALJ's consideration of how much weight to afford the opinion of a treating physician such as Dr. Mulica. We have set forth those factors as

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported

by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (quotation omitted). An ALJ need not expressly apply each of the factors in his decision, but must only give "good reasons in his decision for the weight he gave to the treating sources' opinions." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). The ALJ did precisely that here, and our review of the record indicates that the stated reasons are supported by substantial evidence.

As we understand it, Mr. Vititoe's argument regarding Dr. Matthews, who was his primary care physician since 2003, concerns Dr. Matthews's opinion that although Mr. Vititoe had made a near-complete physical recovery, "[h]e has significant memory problems with trouble finding words and ideas[,] has poor insight, is often impulsive, and is emotionally labile," which makes him "prone to outbursts of anger and prone to depression." Tr. at 941. The opinion was expressed in a letter dated April 27, 2009. Although the ALJ did not address this opinion in his decision, the district court determined, and we agree, that the opinion provides little meaningful analysis of Mr. Vititoe's mental functional abilities and does not require remand. First, Mr. Vititoe has not shown, nor do we see, how the ALJ's failure to address this opinion was harmful. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). The opinion is dated after Mr. Vititoe's

- 11 -

DLI, is conclusory, and provides no insight into the severity of the mental limitations or how they might affect Mr. Vititoe's ability to work. It therefore does not conflict with the ALJ's RFC finding. Second, the opinion is unsupported by any of Dr. Matthews's treatment records, most of which concern matters of physical health and none of which reflect any examination findings concerning Mr. Vititoe's mental abilities or emotional propensities. Third, the opinion is contrary to other substantial record evidence predating Mr. Vititoe's DLI that indicates that his mental impairments were not, at that time, disabling. The ALJ discussed and properly relied on that evidence, including the reports of Ms. Minnick, Dr. Valette, and Dr. Moran. Therefore, Dr. Matthews's opinion is controverted and not significantly probative, and the ALJ was not required to discuss it. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (stating that "an ALJ is not required to discuss every piece of evidence" but must discuss only the evidence supporting the decision and "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects"); *see also Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004) ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened.").

Mr. Vititoe also argues that the Appeals Council erred in determining that Ms. Santistevan's November 11, 2010, opinion was not related to his condition prior to his DLI and therefore did not affect the disability determination. We see no error.

The opinion does not purport to be retrospective to the period before Mr. Vititoe's DLI, nor do we see how it could be so construed; although Mr. Vititoe states that he had been a patient of Ms. Santistevan's since 2001, she did not begin treating him for his post-accident injuries until May 2010, nearly two years after his DLI. The allegation that Mr. Vititoe could not afford to see Ms. Santistevan post-accident until he obtained third-party financial assistance does not alter that fact.

As he did in the district court, Mr. Vititoe attaches the reports from Dr. Weintraub and Dr. Berry to his opening appellate brief and, in his reply brief, asks for a sentence-six remand. And as with Ms. Santistevan, Mr. Vititoe states that he was unable to obtain these additional reports earlier due to lack of funds. Although we sympathize with Mr. Vititoe's situation, the fact remains that the Weintraub and Berry reports do not provide any evidence of Mr. Vititoe's functional abilities prior to his DLI and therefore would not alter the Commissioner's decision. Accordingly, remand is not warranted. *See Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991) (stating that sentence-six remand is appropriate if proffered evidence relates to relevant time period and would have changed the disability determination). We reach the same conclusion regarding two other letters attached to the opening brief, one from Dr. Trudi Wilson, M.D., describing Mr. Vititoe's airway surgeries between September 2008 and December 2011, and one from Dr. Matthews that is materially identical to his April 27, 2009, letter discussed above.

Mr. Vititoe also argues that at step five, the ALJ was required to cite examples and numbers of jobs in Mr. Vititoe's region, not just national numbers, because Mr. Vititoe's need to alternate sitting and standing limits his ability to perform the full range of sedentary work.[5] In support of his argument, Mr. Vititoe first relies on language suggesting a regional approach in Social Security Ruling 96-9p, 1996 WL 374185, at *5 (July 2, 1996). But SSR 96-9p applies in cases where the claimant is limited to less than the full range of *sedentary work* and the disability determination is not directed by the Grids. Here the ALJ found that Mr. Vititoe retains the capacity to perform less than the full range of *light work*, so SSR 96-9p is not applicable. Further, any implied challenge to the ALJ's light-work finding fails because it necessarily rests on the severe limitations in Dr. Mulica's FCQ, which the ALJ properly rejected. Accordingly, Mr. Vititoe's related argument—that he is disabled under Grid Rule 201.00(h)(1) due to his ability to perform less than the full range of sedentary work—also fails.[6]

Mr. Vititoe further relies on two other Social Security Rulings concerning the use of the Grids that are not similarly limited to cases involving less than the full range of sedentary work. Those rulings contain the identical statement that when, as

---

[5] Contrary to the Commissioner's argument, Mr. Vititoe presented this issue in the district court, *see* R. Vol. II at 1059-60, and therefore it is not waived despite the fact that the district court did not address it.

[6] Mr. Vititoe also presented this issue to the district court, *see* R. Vol. II at 1060, contrary to the Commissioner's argument.

here, a VE is used because the Grids do not direct a disability finding, "the determination or decision will include (1) citations of examples of occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work *in the region in which the individual resides or in several regions of the country*." SSR 83-14, 1983 WL 31254, at *6 (1983); SSR 83-12, 1983 WL 31253, at *5 (1983) (emphasis added). But "'work which exists in the national economy'" is defined by statute as "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). Hence, stating that there are a number of jobs available in the national economy is, by definition, stating the incidence of jobs "in the region in which the individual resides or in several regions of the country." Hence, we see no error in identifying the incidence of jobs in the national economy.

Mr. Vititoe also argues that the ALJ failed to include in his hypothetical to the VE his need to lie down for several hours after taking pain medications, the fact that his pain is severe enough to frequently interfere with the attention and concentration necessary to perform even simple work, and the fact that his medications interfere with his cognitive abilities.[7] But the evidence supporting the existence and severity of these limitations (primarily Mr. Vititoe's testimony about his limitations at the time of the hearing in 2010) does not concern or relate back to the period before his

_____

[7] The Commissioner is again mistaken that these arguments are waived on appeal for failure to present them to the district court. Mr. Vititoe presented them to the district court, *see* R. Vol. II at 1061, but the court did not rule on them.

- 15 -

DLI. Accordingly, it was not error for the ALJ to exclude these limitations from his hypotheticals to the VE.

Mr. Vititoe also argues that it was "impossible" for him to "have been able bodied and not disabled" during the month he was in a coma, his rehabilitation at Spalding, and through the several weeks after his release from Spalding, when his mother provided round-the-clock care. This argument reflects a misunderstanding of the requirement that both an impairment and the inability to perform substantial gainful activity must last for twelve months. *See Lax*, 489 F.3d at 1084.

Mr. Vititoe raises several other issues, but we conclude that they are waived for failure to present them to the district court and the absence of compelling reasons to consider them. *See Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994). Those issues are (1) the ALJ erred in not filling out the Psychiatric Review Technique; (2) the ALJ failed to include an adequate sit/stand limitation in his hypothetical to the VE; (3) the opinions of the consulting examiners, Drs. Valette and Moran, are not substantial evidence supporting the ALJ's decision because they only examined Mr. Vititoe once, the Commissioner paid them for their services, and they lack qualifications; and (4) Mr. Vititoe meets Listing 12.02. Even if we were to consider these issues, we would find them unpersuasive for substantially the reasons stated in the Commissioner's brief.

- 16 -

## III.  CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Wade Brorby
Senior Circuit Judge