FILED
United States Court of Appeals
Tenth Circuit

May 28, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RUBEN JESSIE HERNANDEZ,

Plaintiff - Appellant,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant - Appellee.

No. 13-1325
(D.C. No. 1:12-CV-01783-WJM)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HOLMES**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

Ruben Jesse Hernandez filed an application for disability insurance benefits

and supplemental security income in which he alleged that he was disabled due to

back, neck, and wrist pain, numbness in his hands, high blood pressure, heart

problems, and difficulty hearing. On remand from the Appeals Council, the

administrative law judge (ALJ) conducted a second hearing and issued a written

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

decision in which he denied the claim. The Appeals Council denied Mr. Hernandez's request for review and the ALJ's decision became final. The district court affirmed the ALJ's decision. This appeal followed. Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

I.

Mr. Hernandez was forty-six years old in November 2006 – the onset date of his alleged disability. He was a high-school graduate who had worked as a forklift operator from 1982 to 2003, and as a laborer from May to November 2006, when he was laid off from that seasonal job.

As part of the application process, Velma Campbell, M.D., an occupational specialist, examined Mr. Hernandez in September 2007. Dr. Campbell diagnosed him with: (1) a heart irregularity; (2) shortness of breath; (3) high blood pressure; (4) chronic low back and right hip pain; (5) pain and cracking in the shoulders and knees suggestive of osteoarthritis; and (6) some hearing loss. As to his lower extremities, Dr. Campbell opined that Mr. Hernandez could: (1) bend, stoop, and squat up to two hours per day; (2) stand and walk less than four hours per day; and (3) sit throughout the day so long as he could change position frequently. As to his upper extremities, Dr. Campbell found that Mr. Hernandez could use his arms overhead less than two hours per day. She also noted "evidence of cognitive dysfunction [and] a history of learning disorder that could affect development of new occupations." R. at 285.

In July 2008, Mr. Hernandez first saw his treating physician, Vui Mai, M.D. His visit was apparently prompted by his need to be certified for a state program that provided benefits for persons who were temporarily totally disabled. He complained about pain in his hands, wrists, left shoulder, and neck. Dr. Mai found that he had a full range of motion in all joints and some cracking in his left shoulder. Because there was a suggestion of carpal tunnel syndrome, Dr. Mai recommended that Mr. Hernandez undergo a neurological test to determine whether, in fact, he had carpal tunnel, but Mr. Hernandez lacked the funds for the test. Mr. Hernandez also declined, for cost reasons, prescription medicines to ease his symptoms.

Mr. Hernandez returned to Dr. Mai in September 2008, complaining again of pain in his wrists and back. He told Dr. Mai that he was not taking any prescription medications because he could not afford them. Dr. Mai opined that Mr. Hernandez was temporarily totally disabled due to his chronic lower back pain and possible carpal tunnel, but that medical treatment could alleviate his symptoms. Dr. Mai told Mr. Hernandez that if he did not comply with her medical recommendations, she would not re-certify him for state benefits.

In January 2009, Mr. Hernandez told Dr. Mai that his pain was adequately controlled with over-the-counter medications. Nonetheless, Dr. Mai recommended an MRI and continued to press for the carpal tunnel test. A few days later, Dr. Mai completed a physical residual functional capacity assessment. She said that she was not qualified to assess any restrictions regarding lifting, carrying, sitting, standing,

and walking, and deferred to Dr. Campbell's September 2007 evaluation. As to the use of the upper extremities, Dr. Mai stated that she was "unable to evaluate" whether Mr. Hernandez was restricted in any way. *Id*. at 357. Nonetheless, Dr. Mai completed the form by stating that if any restrictions existed, Mr. Hernandez was limited to "[r]are" reaching. *Id*.

In February 2009, Mr. Hernandez had his first hearing before the ALJ. He testified that he was laid off from his most recent job, which included "patching holes, street sanitation, and some concrete [work]," because it was a seasonal job. *Id*. at 31. He also testified he injured his back in 2003, and returned to work in 2006 because he ran out of money. Regarding his physical problems, he testified that numbness in his hands caused him to drop things, he could not sit or stand for extended periods of time, and he needed to walk around regularly. He said nothing about any psychological problems or a learning disability.

In March 2009, Dr. Mai discussed the results of an MRI, which showed mild degenerative disc disease but no acute abnormalities. She again noted Mr. Hernandez's refusal to take the prescribed medications or have the test for carpal tunnel. Dr. Mai wrote that if Mr. Hernandez followed the medical recommendations, "his symptoms could be under control [and] he could go back to his job." *Id*. at 349.

At appointments in July and August 2009, Mr. Hernandez said that he was using over-the-counter medications and did not report any pain in his neck, shoulders, or elbow. He denied being depressed. Dr. Mai observed normal ranges of

motion in all joints, equal strength in all extremities, and a bright and pleasant affect. Still, because Mr. Hernandez had some pain, Dr. Mai authorized further state benefits. At another appointment in November 2009, Mr. Hernandez reported to Dr. Mai that his back pain was helped "quite a bit" by over-the-counter medications. *Id.* at 341. Once again, Dr. Mai observed normal ranges of motion in all joints and equal strength in all extremities.

Just one week prior to his November 2009 appointment with Dr. Mai, Mr. Hernandez saw Jose Vega, Ph.D., a psychologist, for a mental-health examination. Mr. Hernandez was referred to Dr. Vega by his lawyer. Dr. Vega diagnosed Mr. Hernandez with depression and a possible learning disorder. He also noted his suspicion that Mr. Hernandez "functions within the borderline range of intelligence." *Id.* at 326. Dr. Vega concluded that Mr. Hernandez had "difficulty in recall and maintaining and sustaining attention and concentration for extended periods of time which would affect his ability to be employed, particularly in the competitive job market, particularly on those tasks that require those abilities." *Id.* He could not say whether Mr. Hernandez's alleged pain had a psychological or medical origin.

Despite Mr. Hernandez's record of employment, including more than twenty years operating a forklift, Dr. Vega opined in the mental residual functional capacity assessment that there were twelve categories in which Mr. Hernandez had "Marked" through "Extreme" limitations, with "Marked" defined as "Serious limitations . . .

ability to function . . . severely limited but not precluded" and "Extreme" defined as "Severe limitations . . . [n]o useful ability to function." *Id*. at 327. In the eight remaining categories, Dr. Vega found that Mr. Hernandez had "Moderate" to "Marked" limitations, with "Moderate" defined as "still able to function." *Id*. Some examples of the "Marked" through "Extreme" limitations found by Dr. Vega included: "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances . . . [t]he ability to work in coordination with or in proximity to others without being distracted by them . . . [and] [t]he ability to travel in unfamiliar places or use public transportation." *Id*. at 327-28.[1] We note that there is nothing specific in the narrative of Dr. Vega's interview with Mr. Hernandez, including the results of the mental status examination, that appears to support "Marked" or "Extreme" limitations in these or several other areas categorized by Dr. Vega as "Marked" or "Extreme."

Neurological testing for carpal tunnel was performed by Khoi Pham, M.D., in December 2009. Dr. Pham opined that Mr. Hernandez did not have carpal tunnel in either wrist and stated that his complaints were "likely from overuse or degenerative changes." *Id*. at 339.

---

[1] Dr. Vega circled both "Marked" and "Extreme" and drew an arrow pointing from "Marked" to "Extreme" on the mental residual functional capacity form. He also circled both "Moderate" and "Marked" and drew an arrow from "Moderate" to "Marked." Although we are not prepared to categorically reject this approach, we caution future evaluators not to provide a range of limitations, but to follow directions on the form and indicate the limitations using *one* category.

Mr. Hernandez had his next appointment with Dr. Mai in January 2010. Dr. Mai wrote that Mr. Hernandez presented with a bright and pleasant affect, good judgment, normal gait, normal ranges of motion in all joints, equal strength in all extremities, and a normal shoulder examination. Dr. Mai nonetheless ordered x-rays of Mr. Hernandez's wrists and neck. The wrist x-rays showed "no evidence of fracture, dislocation, arthritic, or inflammatory changes." *Id*. at 329. And the neck x-ray showed only mild degenerative changes.

At his second hearing in June 2010, Mr. Hernandez raised for the first time his alleged psychological problems/learning deficits. For example, he testified that the only information he could read and understand in his case-related notices was "where it says time, place." *Id*. at 50. He also claimed that he was limited to reading children's books, had a hard time learning things, was unable to follow instructions or directions, and had constantly been getting lost "[e]ver since school." *Id*. at 51. Mr. Hernandez could not explain why he failed to raise these alleged problems in 2007 when he applied for benefits, at his first hearing, or why they had not prevented him from working in the past, especially for more than twenty years in a semi-skilled occupation as a forklift operator.

The ALJ determined that Mr. Hernandez could perform light work, with the following limitations: (1) standing and walking limited to two to four hours in an eight-hour workday; (2) sitting limited to at least six hours in an eight-hour workday (allowing for frequent postural shifting or changes); (3) occasional pushing and

pulling with the upper extremities; (4) occasional overhead reaching; and (5) unskilled work.

The ALJ asked the vocational expert (VE) to assume a person of the same age, education, vocational history, and residual functional capacity described above. The VE testified that this hypothetical person could not perform Mr. Hernandez's past relevant work, but could perform the sedentary work of a food and beverage order clerk, call-out operator, or document preparer. He further opined that the hypothetical person could perform the light work of an office helper, although the 2,285 jobs in Colorado and 158,110 jobs in the national economy would be eroded by about one-third to accommodate the additional limitations noted in the ALJ's hypothetical. Based on the VE's testimony, the ALJ concluded at step five of the sequential evaluation process that there were jobs that existed in significant numbers in the national economy that Mr. Hernandez could perform and, therefore, he was not disabled.

## II.

Mr. Hernandez argues that the ALJ's decision should be set aside because the ALJ failed to: (1) properly assess his mental impairments; (2) properly assess the opinion of his treating physician; and (3) apply the grids to determine whether he was disabled. We disagree.

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct

legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted). In other words, "[w]e consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's." *Id.* (internal quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,] [and] requires more than a scintilla, but less than a preponderance." *Id.* (internal quotation marks omitted).

III.

According to Mr. Hernandez, the ALJ's residual functional capacity assessment that limited him to unskilled work, did not adequately account for the mental health limitations expressed by Dr. Vega. More specifically, he argues that because the ALJ did not reject Dr. Vega's opinion entirely, the ALJ was required to explain which portions of the opinion he accepted and which portions he rejected instead of "converting them into unskilled work." Aplt. Opening Br. at 9. He argues additionally that because the ALJ did not explain which portions of Dr. Vega's opinion he accepted, this court is "unable to review whether the ALJ correctly equated the mental health limitations with unskilled work." *Id.* at 14.

The parties agree that the ALJ followed the law in affording Dr. Vega's opinion "little weight," and that this conclusion is supported by substantial evidence. *See* 20 C.F.R. § 404.1527(c) (listing the factors to consider in assigning weight to an

examining source opinion).[2]  Where the parties disagree is on whether the ALJ's

limitation to "unskilled" work was based a mental health limitation that the ALJ

failed to identify, or his learning disorder, which the ALJ acknowledged.  A careful

review of the ALJ's decision convinces us that the limitation was based on

Mr. Hernandez's alleged learning disorder – not some other mental health limitation.

We further conclude that this finding is supported by substantial evidence.  Our

review also convinces us that when the ALJ said that he afforded "little weight" to

Dr. Vega's report, he was referring to its discussion of Mr. Hernandez's suspected

learning disorder – not some other mental impairment.

In analyzing the severity of Mr. Hernandez's alleged mental impairments, the

ALJ explained Dr. Vega's report in light of Dr. Campbell's 2007 assessment that

included "evidence of cognitive dysfunction and a history of a learning disorder."

*Id*. at 13.  In addition, the ALJ specifically discussed Mr. Hernandez's testimony that

"he had difficulties with various subjects in school and he reported that it was

difficult and is difficult for him to learn things and to understand what he reads."  *Id*.

These findings all speak a learning disorder – not some other mental health

impairment.  It is true that the ALJ discussed the findings of Dr. Vega's mental

residual functional capacity assessment, but the ALJ specifically noted the lack of

_____

[2]      Part 404 of the Code of Federal Regulations, which applies to disability
insurance benefit claims, have parallel citations to Part 416 of the Code, which
applies to supplemental security income claims.  We cite only to Part 404.

any objective evidence to support any mental health limitation other than a possible learning disorder.

In his residual functional capacity assessment, the ALJ recognized that Mr. Hernandez's "work would have to be unskilled." *Id*. at 16. Immediately thereafter, the ALJ noted that Dr. Campbell's report "identifie[d] an indication of cognitive dysfunction and a history of a learning disorder . . . [but] the condition has remained untreated as far as any secondary psychiatric condition and [Dr. Vega's] examination . . . concluded or opined that a learning disorder is only 'suspected.'" *Id*. This language bolsters our conclusion that the ALJ was referring to a possible learning disorder – not some other mental condition.

We also disagree with Mr. Hernandez's other argument that the limitation to "unskilled" work did not adequately address his learning disorder. An ALJ's limitation to "unskilled" work may not, under certain facts, adequately address a claimant's mental limitations. *See Chapo v. Astrue,* 682 F.3d 1285, 1290 n.3 (10th Cir. 2012) (recognizing that restrictions to unskilled jobs does not in all instances account for the effects of mental impairments). *Chapo*, in turn, relied on an unpublished decision of this court, *Wayland v. Chater*, Nos. 95-7029 & 95-7059, 1996 WL 50459, at *2 (10th Cir. Feb. 7, 1996), in which we recognized that "there may be circumstances in which a particular mental limitation could be so obviously accommodated by a reduction in skill level that" other limitations need not be discussed. This is one of those circumstances. First, there was no evidence that

Mr. Hernandez could not perform "[u]nskilled work . . . which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Second, there was no evidence about any particular limitations in performing work at an unskilled level that Mr. Hernandez experienced as a result of his learning disorder. To the contrary, Mr. Hernandez's "past work as a forklift operator which is a semi-skilled position and other work at the semi-skilled level [led the ALJ to] conclude[] that the implications of any learning disorder in terms of work capacity would be mild at best, and is accommodated with the unskilled parameter provided in this residual functional capacity." R. at 16. Last, because the ALJ did not make any specific findings regarding any mental limitations other than a possible learning disorder, the limitation to "unskilled" work was sufficient. We acknowledge that a limitation to "unskilled" work may be too broad to account for all the limitations where an ALJ makes specific findings regarding a claimant's mental impairments. *See, e.g.*, *Wiederholt v. Barnhart*, 121 F. App'x 833, 839 (10th Cir. 2005) (holding that where the ALJ makes findings regarding mild restrictions in the claimant's daily activities, mild difficulties with social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, a general limitation to "unskilled" work is inadequate). But in this case the ALJ made no such findings and the limitation to "unskilled" work was adequate.

IV.

In formulating Mr. Hernandez's residual functional capacity, the ALJ found that he was limited to "occasional" overhead reaching, consistent with Dr. Campbell's opinion. R. at 16. Mr. Hernandez argues that the ALJ should have adopted Dr. Mai's opinion that Mr. Hernandez could only rarely use his upper extremities for reaching. *Id*. at 357. Whether we view this argument as a failure to properly weigh the treating physician's opinion or an improper picking and choosing of the evidence, the result is the same. The ALJ's conclusion that Mr. Hernandez was restricted to "occasional" overhead reaching is supported by substantial evidence, and the ALJ did not commit legal error by failing to specifically discuss Dr. Mai's "conflicting" opinion.

When Dr. Campbell examined Mr. Hernandez in September 2007, she noted that "[s]ensation [was] intact throughout [his] upper extremities, but tingling in the hands is reported with elevation of the arms above shoulder height for more than 1 minute." *Id*. at 284. As such, Dr. Campbell concluded that the "[u]se of the upper extremities is limited in overhead use to less than 2 hours a day." *Id*. at 285. Dr. Mai completed a physical residual functional capacity assessment in January 2009, in which she stated that she was "not qualified to make [an] assessment" of how much weight Mr. Hernandez could lift, and deferred to Dr. Campbell's findings. *Id*. at 355. She also deferred to Dr. Campbell's findings concerning how much weight Mr. Hernandez could carry and for what portion of a work day, as well as how long

- 13 -

he could sit during a work day.  In response to the question whether Mr. Hernandez's "condition restrict[ed] his ability to use his/her upper extremities," Dr. Mai stated that she was "unable to evaluate" any such restrictions, but opined that it was "most likely [secondary] to carpal tunnel," and concluded that he could rarely reach. *Id*. at 357.

Despite disavowing the ability to evaluate Mr. Hernandez's use of his upper extremities, Mr. Hernandez urges us to find that Dr. Mai "did not defer to Dr. Campbell's reaching restriction, but instead . . . issued her own conflicting opinion."  Aplt. Opening Br. at 20.  And because the ALJ found that Dr. Mai's opinion was entitled to "some weight," Mr. Hernandez argues that the ALJ erred by failing to give controlling weight to Dr. Mai's opinion.  We disagree.

If an ALJ declines to give controlling weight to a treating physician's opinion, then the ALJ must decide how much weight to assign the opinion.  We are not at all certain that Dr. Mai gave any opinion as to Mr. Hernandez's ability to reach, but assuming her comments amounted to an opinion, the ALJ considered the factors listed in 20 C.F.R. § 404.1527(c) and gave "good reasons in the . . . decision for the weight he ultimately assign[ed] the opinion."  *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotation marks and brackets omitted).  Of course, an ALJ is not required to explicitly discuss all of the factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Specifically, the ALJ considered and discussed the treatment relationship between

- 14 -

Dr. Mai and Mr. Hernandez, including the length of the relationship, Dr. Mai's acknowledged lack of expertise in occupational medicine, and the lack of objective evidence to support the opinion. This was more than enough to justify the weight afforded to Dr. Mai's assessment.

V.

Last, Mr. Hernandez argues that under a proper application of the medical-vocational guidelines, 20 C.F.R. pt. 404, Subpt. P, App. 2 (the grids), the ALJ should have found him disabled.[3] We disagree.

Although the "grids . . . may provide a shortcut in certain circumstances to determining whether a claimant can perform other work by obviating the need for a vocational expert's testimony . . . the [ALJ] may not apply the grids conclusively . . . unless the claimant's characteristics precisely match the criteria of a particular rule." *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998) (internal quotation marks omitted). Under Grid Rule 201.14, the ALJ would have been compelled to find Mr. Hernandez disabled if he was limited to only sedentary work in light of his advanced age and lack of transferrable skills. However, the VE testified that Mr. Hernandez could perform the light work of office helper, albeit with one-third fewer jobs available in the national economy due to the additional limitations.

---

[3] "The grids are matrices of the four factors identified by Congress – physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998) (internal quotation marks omitted).

We agree with Mr. Hernandez that SSR 83-12, 1983 WL 31253 (1983) guides the ALJ in these circumstances. We disagree, however, that the ALJ was compelled to find him disabled under SSR 83-12(2)(b), which provides that "if the exertional capacity is significantly reduced in terms of the regulatory definition [of light work], it could indicate little more than the occupational base for the lower rule [of sedentary work] and could justify a finding of 'Disabled.'" *Id*. at *2. The regulation says "could," which indicates that such a finding is permissive – not required. The VE's testimony was sufficient to establish that Mr. Hernandez could perform substantial gainful work at the light category and, therefore, was not disabled.

The judgment of the district court is affirmed.

Entered for the Court

Stephen H. Anderson
Circuit Judge