FILED
United States Court of Appeals
Tenth Circuit

August 2, 2022

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MICHELLE BECKLEY KIDD,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 21-1363
(D.C. No. 1:20-CV-01357-LTB)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.
_____

Michelle Beckley Kidd appeals from the district court's order denying her

application for Social Security disability insurance benefits.  Exercising jurisdiction

under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

## I.  BACKGROUND

In her initial application for benefits, Ms. Kidd alleged she was disabled

beginning December 31, 2011, through December 31, 2015, and sought benefits for

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument.  _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
submitted without oral argument.  This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel.  It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

those years.  Following a hearing, the administrative law judge ("ALJ") determined

that she was not disabled and denied benefits.  The Appeals Council reversed and

remanded for the ALJ to consider Ms. Kidd's residual functional capacity ("RFC").

On remand, Ms. Kidd amended the alleged onset date to December 17, 2013.

The ALJ conducted a second hearing.  Using the five-step sequential

evaluation process,[1] the ALJ determined Ms. Kidd had the following severe

impairments:  "depression; anxiety; sleep apnea; asthma; obesity; hypertension;

neurogenic bladder; irritable bowel syndrome; carpal tunnel syndrome; a history of

congenital spina bifida with chronic back pain; and, status-post multiple surgeries

(2007-2010) for a vascular malformation."  Aplt. App., Vol. 3 at 70 (boldface

omitted).  The ALJ further noted "that in October 2015 [Ms. Kidd] sustained a left

rotator cuff tear, which was surgically repaired on November 18, 2015.  She

subsequently underwent physical therapy . . . between January and June 2016, as well

as [physical therapy and a series of injections] for problems with her left knee,"

---

[1] The Social Security Administration employs a five-part sequential evaluation to determine whether a claimant is disabled.
  (1) The claimant must establish she is not engaged in substantial gainful activity.
  (2) The claimant must establish she has a medically severe (a) impairment or (b) combination of impairments.
  (3) The ALJ must determine whether any medically severe (a) impairment or (b) combination of impairments is equivalent to any of the impairments listed in the regulation that preclude substantial gainful employment.  If listed, the impairment is presumptively disabling.
  (4) The claimant must establish her impairment prevents her from performing her past work.
  (5) The Commissioner must show the claimant has the residual functional capacity to perform other work in the national economy.
See 20 C.F.R. § 404.1520; Williams v. Bowen, 844 F.2d 748, 750-53 (10th Cir. 1988).

2

which developed in December 2015. *Id.* at 71 (citation omitted). Although the ALJ found that the knee and shoulder impairments were not severe because they did not meet the duration requirement, the ALJ considered them and their resulting limitations in assessing Ms. Kidd's RFC.

At step four of the five-step sequential evaluation process, the ALJ found that Ms. Kidd retained the RFC to perform a range of light work, with the following limitations relevant to this appeal: sit for six hours and stand and/or walk for six hours in an eight-hour workday; a stand/stretch option such that she could sit or stand at a workstation, provided she could remain on task and not be off task more than 10% of the time; frequently push or pull with both arms; occasionally operate foot controls with her right leg and frequently with her left leg; occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; occasionally lift overhead within 18 inches to the front and sides of the body with her left arm and frequently lift in all other directions; no exposure to cold or hot temperature extremes; occasional exposure to wetness, humidity, and excessive vibration; no exposure to coarse vibration with her left arm; and occasional exposure to environmental irritants, such as fumes, odors, dusts, and gases.

At step five, the ALJ found Ms. Kidd was not disabled because there were a significant number of jobs in the national economy that she could perform. The Appeals Council denied review, the district court affirmed, and Ms. Kidd appeals.

3

## II.  DISCUSSION

On appeal, Ms. Kidd asserts the ALJ (1) failed to include appropriate limitations based on central sleep apnea in assessing her RFC, (2) misinterpreted the duration requirement for her knee and shoulder impairments, (3) erred in discounting the opinion of an examining medical consultant, and (4) erred in finding that her reported symptoms were inconsistent with the medical evidence.

### A.  *Standard of Review*

"We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quotations omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084 (quotations omitted).

"We consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but we will not reweigh the evidence or substitute our judgment for the Commissioner's."  *Id.* (quotations omitted).  Thus, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  *Id.* (quotations omitted).

"[T]he failure to apply proper legal standards may, under the appropriate circumstances, be sufficient grounds for reversal independent of the substantial evidence analysis." *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quotations omitted). But the failure to apply the proper legal standard requires reversal only where the error was harmful. *Cf. Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (placing the burden to show harmful error on the party challenging an agency's determination).

## B. *Analysis*

With the foregoing standards in mind, we address Ms. Kidd's four assertions of error.

### 1. **Central Sleep Apnea**

Ms. Kidd maintains the ALJ failed to include appropriate limitations based on central sleep apnea in the RFC. We disagree.

In 2010, Ms. Kidd was diagnosed with both obstructive and central sleep apnea. Initially, she used a continuous positive airway pressure machine and oxygen at night, but she continued to have unrefreshing sleep and nocturnal gasping. In early 2013, she tried an Adaptive Servo Ventilation machine (ASV) for a few days, but decided not to use it because it exacerbated her pulmonary hypertension and caused chest pain. Eventually, Ms. Kidd began using a bi-level positive airway pressure machine (BiPAP) and nighttime oxygen, which resulted in some improvement.

Richard Carson, M.D., performed a consultative medical examination in October 2014. He noted Ms. Kidd's chief complaints as back pain, sleep apnea, and

stomach issues. He wrote that Ms. Kidd "has been diagnosed with sleep apnea, *both central and obstructive*," and because she gets only a few hours of sleep each night, she reports "feel[ing] tired all the time and has difficulty concentrating." Aplt. App., Vol. 7 at 36 (emphasis added). Although Dr. Carson was aware of Ms. Kidd's diagnosis and complaints of chronic fatigue, he did not list any limitations related to sleep apnea.

In August 2017, David Wallack, M.D., also performed a consultative medical examination. He noted that Ms. Kidd had been diagnosed with "[s]leep apnea, central." *Id.*, Vol. 10 at 61. She reported "trouble falling asleep, . . . trouble staying asleep," and being "tired and forgetful." *Id.* Like Dr. Carson, Dr. Wallack listed no limitations based on sleep apnea.

At the first administrative hearing in September 2017, Ms. Kidd testified she had "severe central sleep apnea, and [her] sleep is just horrific." *Id.*, Vol. 3 at 109. As a result, she said she was foggy, had difficulty concentrating, and typically slept three hours during the day.

Medical expert Steven Golub, M.D., testified at the second administrative hearing in June 2019. He said Ms. Kidd had been diagnosed with both obstructive and central sleep apnea and used a BiPAP machine and supplemental oxygen at night. When the ALJ asked about environmental limitations relative to Ms. Kidd's impairments, Dr. Golub said she should have "only occasional exposure to pulmonary irritants and probably no exposure to extreme cold." *Id.* at 176. Ms. Kidd's attorney asked about the "likely adverse effects of . . . sleep apnea." *Id.*

6

at 186.  Dr. Golub explained that Ms. Kidd suffered primarily from central sleep apnea, and "there are multiple possible effects from [central] sleep apnea, but . . . essentially, what it can do is [it] can cause increased pulmonary hypertension . . . [and] shortness of breath on exertion.  [T]hat's why I included . . . exposure to irritants—pulmonary irritants, [and to] also avoid certain temperatures."  *Id.* at 186-87.  Dr. Golub also acknowledged that sleep apnea can cause fatigue but did not identify any fatigue-related limitations.

Incorporating the limitations testified to by Dr. Golub in the RFC, the ALJ found that Ms. Kidd "should not have exposure to temperature extremes of cold/hot" and "could have [only] occasional exposure to environmental irritants such as fumes, odors, dusts and gases."  *Id.* at 74 (boldface omitted).

Ms. Kidd maintains the ALJ should have included other limitations in the RFC, namely chronic fatigue and her need to sleep for several hours during the day.  After reviewing all the evidence, the ALJ determined there were either no limitations based on central sleep apnea or only those identified by Dr. Golub.  Substantial evidence supports this finding.  We thus affirm.

2. **Duration Requirement**

Ms. Kidd argues that the ALJ misinterpreted the duration requirement for her knee and shoulder impairments.  We conclude that any such error was harmless.

In October 2015, Ms. Kidd injured her left rotator cuff.  In November, she had successful left shoulder surgery and was referred to physical therapy.  On December 1, she experienced pain and swelling in her left knee and visited the emergency room.

7

On December 3, an orthopedist diagnosed Ms. Kidd with a meniscus tear and primary osteoarthritis. She was treated conservatively with cortisone injections, physical therapy, home exercises, and a knee brace.

In January 2016, Ms. Kidd completed a report as part of her benefits application indicating that she cooked and cleaned for her three sons and her husband; drove her children to sporting events and games; did household chores, such as laundry, light cleaning, and planting flowers; and shopped for groceries. In February, she reported a "[m]oderate activity level," including walking and exercising several times a week. *Id.*, Vol. 10 at 105. At a physical therapy appointment in early March, Ms. Kidd said that the injections were "starting to help overall." *Id.* at 37. By mid-March, she said that her shoulder felt "'amazing,'" *id.* at 84, and her knee felt "'great,'" *id.* at 30. Thereafter, Ms. Kidd had mostly minimal knee and shoulder complaints. By the end of physical therapy treatments in September, she had met her goals and was able to manage her symptoms on her own. Records from a visit to a pain management clinic in November note that her pain medications "continue to be tolerated well and [are] efficacious." *Id.*, Vol. 11 at 68.

The ALJ determined that the knee and shoulder impairments "are not considered severe medical impairments that more than minimally affected [Ms. Kidd's] ability to work for the requisite duration of at least 12 continuous months on and before [Ms. Kidd's] date last insured." *Id.*, Vol. 3 at 71.[2] In other words, the

---

[2] The term "date last insured" refers to the last date on which Ms. Kidd met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423. The

ALJ interpreted the duration requirement to mean that an impairment is not considered severe unless it existed for twelve continuous months before the date last insured.

The Commissioner concedes the ALJ likely errored because there is no requirement that the entire twelve-month period predate the date last insured for an impairment to be deemed severe. Instead, it is enough that an impairment, expected to last twelve continuous months arose before the date last insured. *See* 20 C.F.R. § 404.1509 (requiring that an impairment last or be expected to last 12 continuous months to be considered severe); 42 U.S.C. § 423(d)(1) (defining "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").

Despite the ALJ's apparent misinterpretation of the duration requirement, the Commissioner maintains that Ms. Kidd "cannot meet her burden to show that she was prejudiced by this mistake." Aplee. Br. at 26. We agree because the ALJ included limitations in the RFC based on the shoulder and knee impairments.

---

ALJ found, and the parties agree, that Ms. Kidd's "earnings record shows that [she] has acquired sufficient quarters of coverage to remain insured through December 31, 2015 (hereinafter 'the date last insured')." Aplt. App., Vol. 3 at 68. Thus, to be entitled to a period of disability and disability insurance benefits, Ms. Kidd was required to establish disability on or before December 31, 2015, the date last insured. *See Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007) (requiring a claimant to establish the onset of disability before the expiration of her insured status).

The regulations require an ALJ to consider the combined impact of all impairments, including non-severe impairments, when assessing a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all . . . medically determinable impairments . . . including [a claimant's] medically determinable impairments that are not 'severe' . . . [in] assess[ing] [a claimant's] residual functional capacity."). "Thus, the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016). *See also Smith v. Colvin*, 821 F.3d 1264, 1266-67 (10th Cir. 2016) (finding the ALJ's failure to treat claimant's shoulder impairment as severe at step two to be harmless error when the ALJ considered the shoulder impairment in assessing the claimant's RFC). Here, as in *Allman*, there was no reversible error because the ALJ found several severe impairments at step two, and went on to include the knee and shoulder impairments and their resulting limitations in assessing the RFC.

In particular, the ALJ found that "due to [Ms. Kidd's] . . . knee impairment . . . and ongoing back issues . . . she should [be] permitted a stand/stretch option, such that she could sit or stand at the work station[,] provided that she could remain on task and not be off task more than 10% of the time." *Id.* at 79. "Moreover, . . . because of [Ms. Kidd's] back and *knee problems*," the ALJ found that "she could operate foot controls no more than occasionally with the right lower extremity and frequently with the left lower extremity." *Id.* And because of the *knee impairment*, the ALJ found that she could only "occasionally climb ramps and stairs and

10

occasionally balance, stoop, kneel, crouch and crawl." *Id.* at 79-80. The ALJ incorporated these limitations in the RFC.

The ALJ also found that limitations regarding Ms. Kidd's shoulder impairment were appropriate. "Of note, this includes restrictions on reaching, pushing and pulling with the left upper extremity due to a left shoulder injury and related surgery that occurred just prior to [Ms. Kidd's] date last insured." *Id.* at 76. The ALJ noted that "Dr. Golub . . . concede[d] that due to [Ms. Kidd's] shoulder impairment which was present at the time of her date last insured, she likely would have been limited to occasionally reaching overheard and occasionally reaching forward and to the sides more than 18 inches." *Id.* The ALJ also found that Ms. Kidd "should . . . have no exposure to coarse vibration with the left upper extremity." *Id.* at 79. Once again, the ALJ incorporated these restrictions in the RFC.

Ms. Kidd's argument that the ALJ directed Dr. Golub to ignore Ms. Kidd's knee impairment lacks record support. We have carefully reviewed the transcript from the June 2019 hearing. Although some questions and answers could have been more precise, the ALJ asked Dr. Golub whether he found anything in the record to support any significant limitations based on Ms. Kidd's knee impairment during the relevant period—December 17, 2013, through December 31, 2015. Dr. Golub testified that he did not.[3]

---

[3] Ms. Kidd's attorney could have but did not question Dr. Golub about any limitations based on the knee impairment or ask him to clarify his testimony. *See Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) ("[I]n cases . . . where the claimant was represented by counsel at the hearing . . . the ALJ should ordinarily be

Appellate Case: 21-1363    Document: 010110718947    Date Filed: 08/02/2022    Page: 12

We conclude that the ALJ's apparent misinterpretation of the duration requirement was harmless because the ALJ found other severe impairments at step two and considered the limiting effects of the knee and shoulder impairments in assessing Ms. Kidd's RFC.

3. **Dr. Wallack's Opinion**

Ms. Kidd contends the ALJ improperly discounted Dr. Wallack's opinion. We disagree.

Dr. Wallack performed a consultative medical examination in August 2017. Based on his findings, he opined that Ms. Kidd could sit for only thirty minutes at one time without interruption for a total of four hours in an eight-hour workday, stand for only thirty minutes at one time without interruption for a total of four hours in an eight-hour workday, and walk for only five minutes at a time for a total of forty minutes in an eight-hour workday. He also opined that Ms. Kidd could only occasionally balance and stoop; never climb stairs, ramps, ladders, or scaffolds; and never kneel, crouch, or crawl. According to Ms. Kidd, these limitations should have required a finding of disability at step five.

An examining doctor's opinion "may be dismissed or discounted" if the ALJ properly evaluates it under 20 C.F.R. § 404.1527(c) and provides "specific,

---

entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored, and the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." (quotations omitted)).

legitimate reasons for rejecting it." *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (quotations omitted). "Supportability," a factor used to evaluate medical opinions, means "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give that medical opinion." § 404.1527(c)(3).

The ALJ discounted Dr. Wallack's opinion primarily because it did not address Ms. Kidd's limitations as they existed during the relevant period—December 17, 2013, through December 31, 2015. The ALJ noted that Dr. Carson's 2014 report stated it "was based on examination findings during the relevant period." Aplt. App., Vol. 3 at 81. By contrast, Dr. Wallack examined Ms. Kidd in August 2017. His opinion was based on examination findings made twenty months outside the relevant period.

Moreover, the ALJ found that "many of the limitations opined by Dr. Wallack in August 2017 are attributable to . . . impairments, [that] just recently began to cause [Ms. Kidd] problems," or "were not present" in December 2015. *Id.* at 80. For example, Ms. Kidd told Dr. Wallack in August 2017 that she was in pain and could only walk two blocks. But in February 2016—closer to the relevant period—Ms. Kidd reported walking and exercising three to four times a week, and by March her knee was doing great. Also unavailing is Ms. Kidd's argument that Dr. Wallack's opinion "clearly related back to the time before the date last insured [because the knee impairment] was no worse and no better by 2017." Aplt. Opening Br. at 47.

13

To the contrary, the evidence showed that during the twelve months following December 2015, Ms. Kidd's knee condition improved.

The Commissioner concedes that the ALJ mistakenly stated that Ms. Kidd did not report any knee problems to Dr. Wallack. But the ALJ's misstatement was harmless because limitations found in August 2017 is not probative of any significant limitations during the relevant period.

4. **Consistency of Statements**

Ms. Kidd challenges the ALJ's statement that her "medically determinable [knee and sleep apnea] impairments could reasonably be expected to cause some of the alleged symptoms[,] . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Aplt. App., Vol. 3 at 75. We conclude that substantial evidence supports the ALJ's credibility analysis.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quotations omitted). We will uphold the ALJ's findings as long as they are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (quotations omitted). When considering a claimant's allegations regarding symptoms, an ALJ considers factors such as the objective medical evidence, daily activities, effectiveness of medication, and treatment other than medication used to relieve symptoms. 20 C.F.R. § 404.1529(a), (c).

Here, the ALJ acknowledged Ms. Kidd's complaints that her knee was painful and prevented her from walking more than a few blocks and that her sleep apnea caused fatigue, fogginess, and difficulty concentrating. But in discounting the intensity, persistence, and limiting effects of these symptoms, the ALJ pointed to objective medical evidence and Ms. Kidd's own testimony indicating her knee and apnea conditions improved with treatment. The ALJ also noted that shortly after Ms. Kidd's insured status expired in December 2015, she reported daily activities that included taking care of her three children, tending to basic chores (albeit with assistance), shopping, and other activities.

To support her position, Ms. Kidd makes four arguments.

First, she disputes the ALJ's assessment that an October 2012 treatment note from Christopher A. Trojanovich, M.D., who wrote that Ms. Kidd was a "'full time mom,'" included "no subjective indication that [she] was unable to work on the basis of her medical complaints." Aplt. App., Vol. 3 at 78. Ms. Kidd argues this statement predates the relevant period. But the ALJ cited this evidence in evaluating the consistency of Ms. Kidd's complaints that she suffered *chronic back pain* from surgeries that occurred before the alleged disability onset date, the last of which was in 2010. The ALJ's reference to the treatment note had nothing to do with her knee or sleep apnea.

Second, Ms. Kidd argues that her central sleep apnea significantly deteriorated between Dr. Trojanovich's October 2012 treatment note and her alleged onset of disability in December 2013. But again, the ALJ's evaluation of sleep apnea was not

based on Dr. Trojanovich's note.  It was based on evidence that her apnea improved after she started using the BiPAP machine.

Third, Ms. Kidd also challenges the ALJ's finding of "questionable treatment compliance" for sleep apnea.  *Id.*  But treatment notes from 2014 and 2015 indicating that she had stopped using the ASV machine supported this finding.

Fourth, Ms. Kidd complains that the ALJ, in evaluating her symptoms, considered a treatment note from February 2016 indicating that she walked and exercised three to four times a week and had hobbies of crocheting, photography, and camping.  We need not address this argument because the ALJ did not consider these activities and hobbies in evaluating her symptoms.

We reject Ms. Kidd's argument that substantial evidence fails to support the ALJ's credibility determination.

## II.  CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge